**HARLEY–DAVIDSON, INC., Plaintiff,**

v.

**ESTATE OF Daniel K. O'CONNELL, J. Daniel O'Connell (pro se), and Harley Rendezvous, Inc., Defendants.**

**No. 93–CV–0506 (LEK/DNH).**

United States District Court,
N.D. New York.

June 3, 1998.

---

Michael, Best & Friedrich, Milwaukee, WI, for Plaintiff; Jonathan H. Margolies, of counsel.

Harley–Davidson Motor Corp., Legal Dept., Milwaukee, WI, for Plaintiff; Dyann L. Bumpke, of counsel.

Herzog, Engstrom & Koplovitz, P.C., Albany, NY, for Harley–Rendezvous, Daniel K. O'Connell Estate; Frederick B. Galt, of counsel.

Fernandez & Burstein, P.C., Albany, NY, for defendants; Richard L. Burstein, of counsel.

J. Daniel O'Connell, Waterford, NY, pro se.

## MEMORANDUM–DECISION AND ORDER

KAHN, District Judge.

Plaintiff Harley–Davidson, Inc. ("Harley–Davidson") commenced this action on April 20, 1993 in response to defendants' use of the name "Harley Rendezvous" to refer to their motorcycle-related events. Plaintiff alleged claims for trademark infringement under 15 U.S.C. §§ 1114–1118, false designation of origin or sponsorship under 15 U.S.C. § 1125 and New York common law trademark infringement and unfair competition. The defendants Harley Rendezvous, Inc. ("Harley Rendezvous") and Daniel K. O'Connell ("Kemp O'Connell") (collectively "defendants") answered with affirmative defenses and counterclaims.[1] J. Daniel O'Connell

---

1. When this action was initially commenced, Daniel K. O'Connell was a party defendant. Af- ter his death due to cancer on May 16, 1994, the

("O'Connell") answered separately. Subsequently, both plaintiff and defendants moved for summary judgment. Judge Con. G. Cholakis denied both motions on March 21, 1994. However, after the transferral of the action to this Court, the March 21, 1994 order was vacated on stipulation and the parties were directed to resubmit papers on the propriety of summary judgment. *See Stipulation and Order*, 93–CV–0506, Dkt. No. 120 (Dec. 24, 1996). Parties were also directed to file stipulations of undisputed fact. *Id.*

Defendants have now resubmitted their motion for summary judgment. In turn, plaintiff has cross-moved to strike defendants' affirmative defenses and counterclaims. Each side has submitted its statement of undisputed facts (hereinafter referred to respectively as Def. Undisp. Facts and Pl. Undisp. Facts). For the reasons discussed below, defendants' motion is granted in part and denied in part and plaintiff's motion is denied.

## I. *Background*

Plaintiff has sold motorcycles under its trademark "Harley–Davidson" since 1903. It also sells motorcycle parts, accessories and clothing. Since at least 1978, it has used the name "Harley" in its advertising and promotional materials as an abbreviated name for Harley–Davidson and the associated motorcycles. Plaintiff has also used the trademark "Harley" in its own publication "Enthusiast" since at least 1978.

Harley Rendezvous was started by O'Connell and his son, Kemp O'Connell, in 1979 as an annual fair for motorcycle enthusiasts in general and Harley–Davidson riders in particular.[2] O'Connell has stated that he adopted the name "Harley Rendezvous" for their company and the associated event because "we targeted basically for the Harley–Davidson rider and the Indian rider, which was basically the people that were into American motorcycles.... I called it the Harley Rendezvous because I rode Harley–Davidson motorcycles myself. And there was a thing at that point called the Indian

rally, so this was the thing for Harley riders, which was the Harley Rendezvous." Pl. Undisp. Facts ¶ 12. Harley–Rendezvous filed an application with the Patent and Trademark Office ("PTO") for the mark "Harley Rendezvous" on July 11, 1980, claiming a first use in commerce of September 1, 1979. At this time, Harley–Davidson had not yet filed an application with the PTO for the mark "Harley." Since 1980, the Rendezvous has been held every year on the third weekend in June, and has been held at the same location in Duanesburg, New York every year since 1984. Harley Rendezvous has also expanded the events it holds to include several trade shows. A show in Albany, New York has been held since 1980, a show in New Jersey since 1984, a show in Springfield, Massachussetts since 1988 and a show in Marlboro, Massachussetts since 1989.

In their initial contacts with the defendants, employees of plaintiff Harley–Davidson were cordial and even encouraging. Around February of 1980, O'Connell met with Frank Leiby ("Leiby"), District Manger for Harley–Davidson to explain to him the defendants' plans for the June 1980 fair. In a letter dated February 20, 1980, O'Connell thanked Leiby for his time, announced his intention to build the Rendezvous into a major event and expressed hope that Harley–Davidson would give its active support. Attached to the letter was a Rendezvous advertisement. O'Connell subsequently received a letter dated April 16, 1980 from Wally Peterson ("Peterson"), a Sales Promotion Manager, in which Peterson acknowledged "our subsequent conversations concerning Harley–Davidson factory participation in your Harley Rendezvous, June 20–22, 1980." Def. Ex. B. Peterson informed him that Harley–Davidson could not be involved that year due to other commitments but that they planned "to send someone out to observe your event with an eye to future involvement by Harley–Davidson." Peterson also offered to provide a trophy riding belt for the bike judged "best of show." Def. Ex. B. Subsequently, Harley–

---

parties stipulated to the substitution of his estate as defendant pursuant to Fed.R.Civ.P. 25(a)(1).

**2.** The event will subsequently be referred to as simply the "Rendezvous." The defendant company will continue to be referred to as "Harley Rendezvous."

Davidson did provide the trophy belt and defendants in turn provided Harley–Davidson with two tickets for the 1980 show. Leiby and Peterson both attended.

Between 1981 and 1983, there does not seem to have been much contact between the parties. In a letter dated May 9, 1983, O'Connell invited Willie G. Davidson ("Davidson"), Vice–President of Design at the Harley–Davidson Motor Company (which is owned by one of plaintiff's wholly-owned subsidiaries) to attend the 1983 Rendezvous. Davidson wrote back to decline the offer, pleading other engagements, but added: "Good luck with the rendezvous-say hello to all my friends. Ride free." Def. Undisp. Facts Ex. D.

Although plaintiff's communications with the defendants thus remained friendly, an internal memorandum from Leiby to David Caruso, Vice–President of Marketing, dated June 14, 1983 suggested that he had formed a very negative opinion of defendants' event. He wrote:

> I would like to give you a little background on the Harley Rendezvous and Dan O'Connell and explain why I have not supported this get-together nor have implicated the Motor Company in it in any way. I did attend the Harley Rendezvous in 1980 ... and after evaluation, it was felt that this was not a get-together that the Motor Company should be associated with on an official basis.

Hoelter Dec. Ex. 3. Leiby further expressed concern over the defendants' use of the "Harley" name:

> [i]t is the laymen's opinion because of the name Harley that Harley–Davidson is sponsoring this event. Today I spoke with Carl Strock, reporter for the Schenectady Gazette and informed him that Harley–Davidson was not involved in the Harley Rendezvous whatsoever.

*Id.*

On May 12, 1983, Harley Rendezvous filed an opposition at the PTO to plaintiff's application to register the trademark "Harley" on the grounds that the "opposer owns the service mark 'Harley Rendezvous'...." Def. Undisp. Facts ¶ 20. Despite making this opposition, O'Connell subsequently wrote a letter to Vaughn Beals ("Beals"), Chairman of the Board of Harley–Davidson, Inc., inviting Harley–Davidson to participate in the 1983 Rendezvous with a factory display. Responding to the offer, Timothy K. Hoelter ("Hoelter"), Vice–president and General Counsel for plaintiff, declined, stating that "we simply cannot understand why Harley Rendezvous, Inc. would solicit our support for its independent event on the one hand and, on the other hand, try to oppose our right to use our trademark." Hoelter Dec. Ex. 7.

Vaughn sent a memorandum dated July 5, 1983 to Caruso stating that "[s]ince it appears that O'Connell is not an easy guy to relate to, but since 5 to 10,000 Harley riders are involved, I believe we need to make what peace we can with he and his organization so that he doesn't become a bigger problem in the future." Def. Undisp. Facts Ex. F. He noted that O'Connell was "giving us some problems on trademark licensing" and suggested that Caruso invite O'Connell to the factory to see if they could "clear up the problem." *Id.*

The meeting between Caruso and the O'Connells took place around August of 1983. While the parties agreed to certain terms in principle, they apparently left the meeting with very different perceptions of what they agreed to. Plaintiff believed that the defendants had agreed to drop their opposition to plaintiff's trademark application in exchange for a limited-use two-year license to use the term "Harley" with certain restrictions and sent O'Connell a draft of the agreement on or around September 23, 1983. On September 30, 1983, O'Connell wrote back rejecting the proposed licensing agreement. He asserted that the parties had agreed only that, in exchange for the defendants dropping their opposition to the registration of "Harley," plaintiff would not oppose defendants' use of the word "Harley" so long as it was not used separately from "Rendezvous" or in a style or size which would emphasize it over "Rendezvous." Def. Undisp. Facts Ex. G. O'Connell stated that "we are NOT interested in ANY kind of a 'LICENSING AGREEMENT' from the Harley–Davidson Motor

Co., Inc. particularly inasmuch as they do NOT have the right or ownership of the name 'HARLEY.'" *Id.* He counter-offered with an agreement more in line with his expectations and then concluded that

> [w]e would expect an answer to this letter within two weeks and in the event that we do not hear from you, we will consider that you do not feel it is mutually advantageous to not oppose each other in the conduct of our very separate type businesses.

*Id.*

Plaintiff did not respond to this letter, but the concerns of its employees continued through early 1984. In a memorandum from Leiby to Hoelter dated February 10, 1984, Leiby stated:

> Mr. O'Connell is still managing to really stir up people in this area and unfortunately is continuing to give Harley–Davidson a lot of adverse publicity along with the negative sentiment for his latest move, trying to incorporate a small village so they will be unable to pass zoning restrictions making his Rendezvous impossible. Are we going to continue to be a party to his adverse publicity by allowing him to use our name or is there nothing we can do to prevent this?

Hoelter Dec. Ex. 22. Hoelter replied in a memorandum dated February 17, 1984 that "[o]nce the [PTO] proceedings [are] concluded, we'll turn our attention to Harley Rendezvous directly...." Pl. Undisp. Facts ¶ 30.

Hoelter and O'Connell had a coincidental meeting around May of 1984 at a motorcycle event and Hoelter again raised the possibility of settling their disagreements. Subsequently, Hoelter wrote to O'Connell to say that Harley–Davidson was "mulling over the ideas you and I discussed" and that he would get back to O'Connell in the near future. Pl. Undisp. Facts ¶ 31; Hoelter Dec. Ex. 26. On June 19, 1984, Hoelter wrote to O'Connell about a new proposal for settlement. Without giving the specifics, he stated that

> [t]he resolution would include a slight name change that would still enable you to use the name 'Harley' in describing your event. I believe the proposed arrangement should be acceptable to you, and I

would appreciate your telephoning me so that we might discuss it further.

Hoelter Dec. Ex. 27. It is not apparent from the record that the defendants ever responded to this letter and there were no further attempts by any of the parties to negotiate an agreement.

On April 11, 1985, the PTO granted Harley–Davidson's motion for judgment on Harley Rendezvous' opposition after Harley Rendezvous failed to take any testimony.

Between 1985 and 1987, various agents of Harley–Davidson noted that the Rendezvous continued to operate but that it was suffering a number of legal and financial difficulties which raised doubts that it would continue. The greatest problem for the event was its difficulties with the Zoning Board of Appeals ("ZBA") of the Town of Duanesburg. In 1985, defendants were enjoined in state court from holding their event on the grounds that they had failed to obtain a necessary special use permit from the ZBA. Defendants subsequently ignored this injunction and held their event anyway. An attempt to hold them in contempt resulted in extended litigation. *See Axelrod v. Harley Rendezvous, Inc.*, 128 A.D.2d 957, 512 N.Y.S.2d 908 (N.Y.App.Div. 1987). However, articles submitted by the defendants suggest that the zoning controversy ended in 1988 when the Town Board superseded the authority of the ZBA over the defendants' case and issued Harley Rendezvous a special use permit for their event. Def. Undisp. Facts Ex. I.

During 1985, Harley Rendezvous also suffered internal conflicts. After a falling out with his son, O'Connell ceased to play a role in the internal management of the company (although he continued to own a percentage of the company), leaving Kemp O'Connell to run the event alone. O'Connell also held a competing motorcycle event known as "Daniel O'Connell's Harley Enthusiasts Rendezvous Ltd." Pl. Undisp. Facts ¶ 35; Hoelter Dec. Ex. 32.

Hoelter learned of the change in management from a memorandum written by Leiby, dated February 4, 1985, in which Leiby advised him that despite the existence of O'Connell's separate company, the original Harley Rendezvous, Inc. was still operating:

Don't call off the troops yet.... It seems that Kemp O'Connell is now president of Harley–Davidson Rendezvous, Inc.... At any rate, it is still in existence and I think we should go after our name.

Hoelter Dec. Ex. 21. Harley–Davidson also learned from articles in the Schenectady Daily Gazette, the same source from which Leiby obtained information about defendants' zoning difficulties and internal disputes, that Harley–Rendezvous had been placed in receivership as a result of a suit filed by Kemp O'Connell against his father for allegedly mismanaging the company.

However, despite these and other difficulties, the Rendezvous continued to be run on the same date and location every year. In a memorandum dated March 11, 1987 to Tom Parsons ("Parsons"), a Manager of Trademark Enforcement for plaintiff, Leiby noted an article which related how the 1987 Rendezvous would be held in violation (at that time) of the town zoning laws. Leiby wrote: "Are we doing anything about the use of our name?" Hoelter Dec. Ex. 38. Parsons in turn wrote to Hoelter, asking: "Can we discuss? Should I go after for the name 'Harley' Rendezvous?" *Id.* Hoelter responded: "Keep tabs. I bet it won't go anywhere." *Id.*

On or around September 30, 1991, Hoelter received a copy of a letter from O'Connell offering to sell his interest in Harley Rendezvous (chiefly the value of real estate which the company had purchased). This offer was declined. In that same year, plaintiff allegedly learned that Harley Rendezvous was selling products with Harley–Davidson's trademarks on them and that Harley Rendezvous was infringing other trademarks owned by Harley–Davidson in addition to "Harley," including Harley–Davidson's FAT BOY and ELECTRA GLIDE logo marks. After conferring with counsel, plaintiff commenced this action on April 20, 1993.

## II. Discussion

### A. Cross–Motion To Strike Defenses and Counterclaims

Defendants object to plaintiff's cross-motion to strike defendants' affirmative defenses and counterclaims on the grounds that this Court's December 24, 1996 Order directed the parties to submit papers on the question of summary judgment only. *See* Stipulation and Order, 93–CV–0506 at 1 (Dec. 24, 1996). The Court's language in that order did not make it explicit that summary judgment was the only motion a party could make. However, it is clear that the motion to strike is improper in this case.

Fed.R.Civ.P. 12(f) states:

Upon motion made by a party before responding to a pleading or, if no responsive pleading is permitted by these rules, upon motion made by a party within pleading or, if no responsive pleading is permitted by these rules, upon motion made by a party within 20 days after the service of the pleading upon the party or upon the court's own initiative at any time, the court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter.

Fed.R.Civ.P. 12(f). Plaintiff filed its responsive pleading to defendants' counterclaims on October 23, 1993. The time for a motion to strike the counterclaims is therefore past. It is likewise clear that, as more than 20 days has passed since the service of the Amended Answer on or around October 4, 1993, it is similarly too late to strike defendants' affirmative defenses. Plaintiff's motion must therefore be denied.

### B. Defendants' Motion For Summary Judgment

Fed.R.Civ.P. 56(c) provides in relevant part that summary judgment "shall be rendered forthwith if ... there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." A dispute of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In reviewing the motion, the court must "resolve all ambiguities and draw all inferences in favor of the non-moving party." *Repp v. Webber*, 132 F.3d 882, 889 (2d Cir.1997), *petition for cert. filed*, (May 21, 1998) (NO. 97–1881). Howev-

er, conclusory allegations by the non-moving party will be insufficient to create a material issue of fact. *Id.* "To defeat such a motion, the non-moving party must affirmatively set forth facts showing that there is a genuine issue for trial." *R.B. Ventures, Ltd. v. Shane,* 112 F.3d 54, 57 (2d Cir.1997). With this standard in mind, the Court turns to the defendants' argument.

### C. Laches

▮ Defendants' sole argument on behalf of their motion for summary judgment is that plaintiff's action must be dismissed under the doctrine of laches, which is available to bar trademark-related claims where a plaintiff has unreasonably delayed in commencing an action to enforce its rights to the prejudice of the defendant. *Tri–Star Pictures, Inc. v. Leisure Time Productions B.V.,* 17 F.3d 38, 44 (2d Cir.), *cert. denied, Leisure Time Productions, B.V. v. Tri–Star Pictures, Inc.,* 513 U.S. 987, 115 S.Ct. 484, 130 L.Ed.2d 396 (1994); *see also Conopco, Inc. v. Campbell Soup Co.,* 95 F.3d 187, 193 (2d Cir.1996) (laches applies to misleading advertisement claims as well as trademark infringement claims). This defense is available against both Lanham Act claims and New York state law claims of trademark infringement and unfair competition. *Saratoga Vichy Spring Co., Inc. v. Lehman,* 625 F.2d 1037, 1040–41 (2d Cir.1980); *Tap Publications, Inc. v. Chinese Yellow Pages (New York), Inc.,* 925 F.Supp. 212, 223 (S.D.N.Y.1996). Further, although it is an equitable defense, in the context of a trademark action it may be applied to bar both injunctive relief and damages. *See Tandy Corp. v. Malone & Hyde, Inc.,* 769 F.2d 362, 366 (6th Cir.), *reh. denied,* 777 F.2d 1130 (1985), *cert. denied, Malone & Hyde, Inc. v. Tandy Corporation,* 476 U.S. 1158, 106 S.Ct. 2277, 90 L.Ed.2d 719 (1986); *see also Avon Products, Inc. v. S.C. Johnson & Son, Inc.,* 984 F.Supp. 768, 798 (laches barred both injunctive relief and damages for Lanham Act claim).

▮ To prove this defense, a party must show that 1) plaintiff had knowledge of the infringing activity; 2) plaintiff inexcusably delayed in taking action; and 3) defendants would be prejudiced if plaintiff belatedly asserted its rights. *See Tri–Star Pictures, Inc.,* 17 F.3d at 44. In addition, as an equitable doctrine, laches may not be used to shield a party from the consequences of conduct it knows to be wrongful. *Baker v. Simmons Co.,* 307 F.2d 458, 466 n. 4 (1st Cir.1962) (laches does not apply if defendant had calculated design to trade upon plaintiff's reputation). Thus, defendants must also establish that they acted in "good faith." *McDonald's Corp. v. Druck and Gerner, DDS, P.C.,* 814 F.Supp. 1127, 1136 (N.D.N.Y.1993).

▮ The Second Circuit has recently held that a presumption of laches applies in a trademark action if the plaintiff fails to bring suit within the six-year statute of limitations applicable to state-law fraud in New York. *Conopco, Inc.,* 95 F.3d at 191–92. This six-year period begins to run as soon as the plaintiff discovers the facts which create the cause of action. *Coleman v. Corning Glass Works,* 619 F.Supp. 950, 953 (W.D.N.Y.1985), *aff'd,* 818 F.2d 874 (Fed.Cir.1987). Here, it is undisputed that plaintiff's agents became aware of defendants' use of the word "Harley" in their company name and of the company's intended purpose by early 1980. Around this same time, plaintiff was aware that the event was actually being held. Plaintiff commenced its action roughly thirteen years later. The presumption therefore applies in this case.

The presumption places on plaintiff at least a burden of production, i.e. to defeat defendants' motion for summary judgment, plaintiff must provide sufficient evidence to "rais[e] a genuine issue respecting either [the reasonableness of the delay or the existence of prejudice]...." *A.C. Aukerman Co. v. R.L. Chaides Const. Co.,* 960 F.2d 1020, 1038 (Fed.Cir.1992).[3] With this in mind, the

---

**3.** Whether the presumption also switches to plaintiff the ultimate burden of persuasion is a separate question. *Compare A.C. Aukerman Co., 960 F.2d at 1038* (even where presumption operates, "defendant bears the ultimate burden of persuasion of the affirmative defense of laches.")

*with Conopco, 95 F.3d at 191* (where presumption applies, "plaintiff must aver and prove the circumstances making it inequitable to apply laches to his case." (citations and internal quotations omitted)). The Court finds it unnecessary *to decide this separate question today.*

Court considers each element of laches in turn.

## 1. Delay

Plaintiff argues that it had reasonable excuses for delaying its infringement action for thirteen years. The Court concludes, however, that none of these proffered justifications could reasonably be found to excuse the full extent of the delay.

Plaintiff does not assert any excuse for its delay between February of 1980 and mid–1983. However, a possible excuse is suggested by plaintiff's statement of undisputed facts. According to this document, O'Connell testified that "early on," Harley–Davidson had asked the defendants "to note in [their] advertising that [they] had no connection with the Harley Davidson factory nor corporation in order to avoid 'confusion' on the part of the public." See Pl. Undisp. Facts ¶ 15. Defendant O'Connell also stated that some of the "earlier advertising carried this disclaimer." Id. While this establishes that plaintiff's agents expressed some concern over confusion, it does not establish that they gave the defendants any notice that they believed the use of "Harley" was actionable.

Reliance on an expectation that defendants would use a disclaimer is a weak excuse for a number of other reasons. First, plaintiff does not allege that defendants ever actually agreed to include a disclaimer, or indeed that they ever agreed to do anything to avoid confusion. Second, it is undisputed that the disclaimer appeared only in some of the advertisements and that it could not in any case reach people who heard of the event by-word-of-mouth. Third, plaintiff has not shown during what period of time this disclaimer appeared and thus has not presented sufficient evidence to allow a trier-of-fact to determine over what period of time this excuse might reasonably apply. Finally, it appears from the record that this period of non-activity was ended not because of defendants' failure to use disclaimers but because of *defendants'* opposition to *plaintiff's* trademark. See Def. Undisp. Facts Ex. F (memorandum stated that O'Connell was "giving us some problems on trademark licensing" and suggested that Caruso invite O'Connell to the factory to see if they could "clear up the problem.").

■ Plaintiff's attempt to negotiate a settlement provides some basis for a reasonable excuse. In order to constitute excuse, negotiations "must ordinarily be continuous and bilaterally progressing, with a fair chance of success...." *MGA, Inc. v. Centri–Spray Corp.*, 639 F.Supp. 1238, 1243 (E.D.Mich. 1986). Here, negotiations that had a fair chance of success extended from the meeting of the parties in August of 1993 to September 30, 1983 when O'Connell informed Caruso by letter that defendants were categorically uninterested in any licensing agreement. Further, the meeting between Hoelter and O'Connell in May of 1984 does not extend the negotiation period. There is no evidence that in the period between September 1983 and May 1984 either party had a belief that negotiations were ongoing. Rather, the May 1984 meeting was a chance encounter. Further, there is no allegation that Hoelter received any indication from O'Connell at that meeting that O'Connell was now willing to alter his previous position. Thus, plaintiff's settlement toll extended at most for two months in 1983.

Plaintiff argues that the delay after the negotiations should be excused because its "belief that defendants were no longer a going concern was reasonable." Pl. Mem. at 6. Plaintiff relies in particular on the fact that defendants were unable to obtain a special use permit from the local Zoning Board of Appeals of the Town of Duanesburg, New York ("ZBA") to hold their event and that in 1985, a state court enforcing the ZBA's decision issued a preliminary injunction enjoining the event from being held that year.

These restrictions do not entirely excuse plaintiff for not enforcing its trademark because the actions by the ZBA and the state court were an insufficient basis on which to conclude that the infringement would not occur again. They did not affect defendants' legal right to use the "Harley" name nor did they enjoin the defendants from holding another smaller event or from holding the Rendezvous in another location.

In addition, reasonable excuse has generally meant that plaintiff "has been prevented from asserting [its rights]." *Stone*, 873 F.2d at 625. Thus, excuses have involved situations in which plaintiff *could not* reasonably bring an action such as "justified ignorance of the facts constituting a cause of action, personal disability, or . . . ongoing settlement negotiations. . . ." *Id.* Here, nothing about the permit denials prevented plaintiff from asserting its rights. A belief that circumstances would render the defendants unable to infringe may excuse delay only if plaintiff demonstrates that defendants' legal power to infringe was directly or clearly proscribed. As discussed above, plaintiff has not made such a showing. At best, then, the permit denials constitute a weak excuse. Moreover, the record discloses that the permit denials ended in 1988. Thus, they could not excuse the period from 1988 to 1993 in any case.

Plaintiff also asserts that delay was reasonable because Harley Rendezvous was involved during the relevant period with "bankruptcy disputes" and that it stood at the brink of "financial ruin." Pl. Mem. at 7. There does not appear to be any evidence of a bankruptcy proceeding. If plaintiff is referring to the receivership, it is not clear why this legal action, taken because of internal disputes between the O'Connells, would have suggested that the event would not continue. Although there is an assertion in one article that the Rendezvous lost a substantial sum of money during 1984, the Court does not find that this is a reasonable grounds for believing that the event was no longer a going concern, particularly in light of the fact that the Rendezvous continued to be held year after year under the same name and in the same location.

Plaintiff argues that because of the contempt order which was issued when defendants held their event in spite of a preliminary injunction, defendants have "unclean hands" and should be denied laches on that grounds. The Second Circuit found in *King v. Innovation Books, a Div. of Innovative Corp.*, 976 F.2d 824, 833 (2d Cir.1992) that defendants had made statements evincing both a deliberate intent to infringe plaintiff's statutory rights and an intent to delay plaintiff's discovery of the infringement. The court concluded that such behavior established "unclean hands" and supported the district court's denial of laches. *Id.* However, while fraudulent or deceptive actions directed against the plaintiff can justify denial of laches, defendants' decision to hold a public event in violation of an injunction is clearly not that sort of conduct.

Finally, plaintiff offers no justification for the period after 1988, during which there was no injunction, no apparent financial difficulties and all necessary facts were available to plaintiff either through the local newspaper on which it relied, its local distributor in the area or directly from Harley Rendezvous. Even measuring from this period, the plaintiff's delay of over four years is clearly inexcusable. *See McDonald's Corp. v. Druck and Gerner, DDS., P.C.*, 814 F.Supp. 1127, 1137 (N.D.N.Y.1993) (plaintiff inexcusably delayed asserting its trademark where it first sent protest letters and began settlement discussions two years after constructive notice of the infringement and first brought suit five years after notice).

Plaintiff also argues that its delays should be excused because of the many objections it made to the defendants regarding their use of plaintiff's trademark. However, the record does not demonstrate that plaintiff ever made a clear objection. Early on, it expressed only concern about possible confusion, not a definite assertion that defendants' name was an infringement of its trademark. *See* Pl. Undisp. Facts ¶ 15. Subsequent communications between the parties occurred in the context of defendants' objections to plaintiff's attempt to trademark the term "Harley." The only clear objection which plaintiff made was a cease-and-desist letter directed at O'Connell regarding his event named "Daniel O'Connell's Harley Enthusiasts Rendezvous Ltd." Pl. Undisp. Facts ¶¶ 35, 36. However, plaintiff was aware that O'Connell had by this time broken away from Harley Rendezvous. Hoelter Dec. Ex. 20, 21. A warning to O'Connell regarding his competing event cannot be considered a warning to Harley Rendezvous.

In sum, plaintiff delayed from 1980 to 1983 with little justification and then, after the

collapse of negotiations and the resolution of its PTO proceeding, delayed roughly eight more years before bringing the instant action. Plaintiff's delay during this latter period occurred in the face of the repeated requests by plaintiff's own employees that the issue be addressed and Hoelter's own statement that he would address the problem after the PTO proceeding. The Court finds, therefore, that plaintiff has not provided sufficient evidence to raise a genuine issue of fact as to the question of inexcusable delay.

### 2. Prejudice

A "'mere delay' will not, by itself, bar a plaintiff's suit...." *Saratoga Vichy Spring Co., Inc.*, 625 F.2d at 1040 (other references omitted). "In order to prevail on the affirmative defense of laches, a defendant must prove that it has likely been prejudiced by the plaintiff's unreasonable delay in bringing the action." *Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187, 192 (2d Cir.1996). Because a presumption of prejudice is established in this case, it is plaintiff's burden to make a showing that no prejudice will ensue. *See H & R Industries, Inc. v. Kirshner*, 899 F.Supp. 995, 1007 (E.D.N.Y.1995) ("Unlike the situation where a plaintiff fails to bring an action within the applicable limitations period, prejudice and delay are not presumed....").

"One form of prejudice is the decreased ability of the defendants to vindicate themselves that results from the death of witnesses or on account of fading memories or stale evidence." *Stone v. Williams*, 873 F.2d 620, 625 (2d Cir.), *cert. denied*, 493 U.S. 959, 110 S.Ct. 377, 107 L.Ed.2d 362, *opinion vacated on reh'g on other grounds*, 891 F.2d 401 (2d Cir.1989), *cert. denied, Williams v. Stone*, 496 U.S. 937, 110 S.Ct. 3215, 110 L.Ed.2d 662 (1990). It is undisputed that Kemp O'Connell, who ran the allegedly infringing business with his father and then alone for a period of time, is now deceased. However, defendants do not appear to have suffered any decreased ability to vindicate themselves thereby. The relevant issues in dispute involve defendants' intent and the nature and result of the parties' negotiations around August of 1983 and May of 1984.

O'Connell is available to testify as to these issues. Kemp O'Connell's unavailability does not therefore supply any basis for prejudice.

"Another type of prejudice operates on the principle that it would be inequitable in light of some change in defendant's position to permit plaintiff's claim to be enforced." *Stone*, 873 F.2d at 625. "Specifically, prejudice ensues when a 'defendant has changed his position in a way that would not have occurred if the plaintiff had not delayed.'" *Conopco*, 95 F.3d at 192 (citation and internal quotations omitted).

Plaintiff argues that there is no such prejudice here. It asserts that defendants will not suffer any injury from the delayed enforcement beyond the costs associated with changing the company name. It cites *McDonald's Corp.* for the proposition that prejudice is not established by the "anticipated minimal expenses associated with changing the name on [defendant's] signage and stationary, among other things." *Id.* at 1138.

However, *McDonald's Corp.* based its finding of a lack of prejudice on the conclusion that the defendant was no longer relying on its allegedly infringing trade name to attract customers. *Id.* It does not support the conclusion that the loss of the "good will" value built up in a name cannot itself be prejudicial. Other precedent suggests that such loss will establish prejudice. For example, in *Saratoga Vichy Spring Co., Inc.*, the Second Circuit upheld a finding of laches in a case involving a company's right to enter into the bottled water business under the name "Saratoga Geyser." 625 F.2d at 1042. Although prejudice was not explicitly discussed, it is noteworthy that the court expressly found that the "good will associated with this mark was a large part of the license's value." *Id.*

The Court concludes that prejudice may be found where defendants have built up a valuable association between the name and their business on which they will continue to rely to attract customers, at least where defendants' costs in building that association were significant. *See id.; see also Tap Publications, Inc.*, 925 F.Supp. at 223 (no prejudice from enjoining use of mark where defendant "failed to present any evidence that its

advertisers or readers associate [defendant's] publication with the mark."); *American Express Co. v. American Express Limousine Service, Ltd.,* 772 F.Supp. 729, 738 (E.D.N.Y. 1991) (costs of promoting new name of local driver service did not establish prejudice where customer familiarity with the actual drivers of the company suggested that defendant would suffer only "incidental" costs from changing name); *Olay Company, Inc. v. Cococare Products, Inc.,* 1983 WL 62351, 218 U.S.P.Q. 1028, *1043 (S.D.N.Y.1983), *motion to amend den.,* 1983 WL 44369 (S.D.N.Y.1983) (no prejudice where defendant did not advertise its product to any meaningful extent).

Here, the record amply supports the existence of an association between Harley Rendezvous and the fairs and trade shows which they run. Defendants trademarked their name in 1981 and have used the same name for their event for a period now over thirteen years. They have printed hundreds of thousands of leaflets and spent thousands of dollars advertising their event in national magazines. *See* Def. Undisp. Facts ¶ 32. They have issued a newsletter for a number of years (published quarterly since 1985) under the "Harley Rendezvous" name. Further, their "Harley Rendezvous" event has been discussed in articles in various magazines for motorcycle enthusiasts. Finally, they have also expanded their business under the "Harley Rendezvous" trade name beyond motorcycle fairs to include a number of trade shows. Thus, unlike in *McDonald's Corp.,* there is substantial evidence that defendants have an interest, developed in reliance on plaintiff's delay, in continuing to operate under their current name. *See McDonald's Corp.,* 814 F.Supp. at 1138 (" '[c]ommonly cited criteria of prejudice are the expenditure of significant amounts for the advertising and promotion of the mark or a general business expansion as a result of the increased demand for the product being sold under the mark in question.' "(citation omitted)).

*McDonald's Corp.* is further distinguishable because the plaintiff in that case did not suffer a presumption of laches. There, defendants bore the burden of demonstrating that the costs of altering their name would not be minimal. Here, by contrast, it is plaintiff who must demonstrate that such costs *will* be minimal. Plaintiff has provided no such evidence. Plaintiff does assert that the defendants' event "has succeeded not because of its name (which [plaintiff alleges] has changed a few times over the years), but through word of mouth among motorcycle enthusiasts" and that these enthusiasts will therefore attend regardless of what the name of the event is. Pl. Mem. at 9. However, as to its assertion that the event has ever been referred to by a name other than "Harley Rendezvous," plaintiff appears to be confusing the defendants' Harley Rendezvous event with such events as the "Harley Enthusiast's Rendezvous," which was a competing motorcycle fair apparently held briefly by O'Connell. There is no evidence at all that the name of the event at issue was ever changed since its inception in 1979. Further, plaintiff offers no evidence to support its contention that awareness of the event has spread mainly through word of mouth nor does plaintiff demonstrate why such verbal communications argue against a finding of prejudice. On its face, a word-of-mouth suggestion to visit the "Harley Rendezvous" would seem to add to the name's associative value as effectively as written advertisements. Plaintiff has thus failed to provide sufficient evidence to rebut the presumption of prejudice.

■■■ Concededly, the potential prejudice here is not as serious as in cases where defendant has expanded its business and the enforcement of the right would nullify the actual expansion as opposed to the name under which such expansion occurs. *See, e.g., Stambler v. Diebold, Inc.,* 1988 WL 95479, *4 (E.D.N.Y.1988), *aff'd,* 878 F.2d 1445 (Fed.Cir.1989) (defendant invested millions in manufacturing facility which would be unusable if patent were enforced). However, the amount of prejudice required must be considered in light of plaintiff's showing of excusable delay:

> [A]n evaluation of prejudice ... is integrally related to the inquiry regarding delay. Where there is no excuse for delay; ... defendants need show little prejudice; a weak excuse for delay may, on the other

hand, suffice to defeat a laches defense if no prejudice has been shown.

*Stone v. Williams,* 873 F.2d 620, 625 (2d Cir.), *cert. denied,* 493 U.S. 959, 110 S.Ct. 377, 107 L.Ed.2d 362 (1989), *opinion vacated on reh'g on other grounds,* 891 F.2d 401 (2d Cir.1989).

As noted above, plaintiff offered only weak excuses for the initial three years of delay and for the period after the breakdown of negotiations and the resolution of the PTO proceeding. Further, the period from 1988 to 1993 was not excused at all. In light of these conclusions, the amount of prejudice is sufficient.

*3. Good Faith*

■ Demonstration of "good faith" does not require that the infringer "be in total ignorance of another's mark." *Cuban Cigar Brands N.V. v. Upmann International, Inc.,* 457 F.Supp. 1090, 1098 (S.D.N.Y.1978), *aff'd,* 607 F.2d 995 (1979). However, "it must be able to demonstrate the absence of any *intent* to confuse and deceive the public." *Id.* (emphasis added) (citation omitted). Thus, "there must be a lack of evidence showing a scheme to 'foist upon the public the (products) of the defendant as those of' the plaintiff," *id.* (citation omitted), or in the context of a mark which creates a misleading impression of sponsorship, a lack of evidence showing a conscious intention to create the impression of such sponsorship. *See Saratoga Vichy Spring Co., Inc.,* 625 F.2d at 1042 (no bad faith where evidence did not support conclusion that defendant acted with "conscious fraud").

■ Plaintiff has not pointed to any evidence demonstrating such a conscious intent. It argues that the mere desire of the defendants to attract Harley–Davidson enthusiasts by using the name "Harley" evinces an intent to create the impression of Harley–Davidson sponsorship. The Court finds no such logical connection. Rather, it appears that defendants used the word "Harley" as the most effective way of indicating that the *subject matter* of the fair was the Harley–Davidson motorcycle, not that the sponsor was the Harley–Davidson corporation. The Court

finds therefore that the presumption of good faith is not rebutted.

Although plaintiff does not argue the point, it is possible that the element of "good faith" should be reviewed outside the presumption of laches. Logically, the likelihood of inexcusable delay and prejudice increases with time; by contrast, a bad faith infringer does not gain a patina of good faith merely by infringing for an extended period. *See A.C. Aukerman Co.,* 960 F.2d at 1036 (finding that presumption establishes prejudice and unreasonable delay, but not bad faith). Even assuming that defendants bear the burden of demonstrating good faith, however, it is clear that they have done so. Their burden, at worst, is to show an absence of evidence of bad intent. Upon a full review of the record, the Court has found no evidence of an intent to deceive. O'Connell has testified that the term "Harley" was intended only to indicate that the event was for Harley riders. Pl. Undisp. Facts ¶ 12. There is no evidence that the event was ever explicitly advertised as being sponsored by Harley–Davidson and it is undisputed that O'Connell agreed to use "Harley" only in such a way that it would not stand out from the term "Rendezvous" (although this agreement was not accepted by the plaintiff).

Nor does the Court find any other evidence that defendants consciously intended to infringe on plaintiff's mark. The record demonstrates that defendants believed, erroneously or not, that they were entitled to use the term "Harley" to advertise the fact that their event was intended to be for Harley–Davidson riders. As noted above, plaintiff never made an unambiguous objection to defendants' use of the word "Harley." The Court does not mean to suggest that O'Connell's belief established an actual property right; only that evidence establishing such belief is consistent with a finding of "good faith." In the absence of evidence to the contrary, and assuming that the burden is on the defendants, the Court finds that "good faith" is established as a matter of law. Therefore, plaintiff has not raised an issue of question of fact with regard to any of the elements of the defense of laches.

### 4. Inevitable Confusion

 Harley–Davidson argues that, even if the defense of laches is upheld, it is nevertheless entitled to relief because it has made a showing of "inevitable confusion." While no court in this Circuit has addressed the existence of this partial exception to the laches defense, several other circuits have found that a trademark infringement claim which is barred by laches or acquiescence may nevertheless support injunctive relief upon a particularly strong showing of a likelihood of confusion. *See, e.g., Sara Lee Corp. v. Kayser–Roth Corp.,* 81 F.3d 455, 462 (4th Cir. 1996), *cert. denied, Kayser-Roth Corp. v. Sara Lee Corp.,* —— U.S. ——, 117 S.Ct. 412, 136 L.Ed.2d 325 (1996) (" 'The defense of laches is trumped by a strong showing of likely confusion of the public.' " quoting 4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, § 31.14[1] (3d ed.1995)); *TMT North America, Inc. v. Magic Touch GmbH,* 124 F.3d 876, 886 (7th Cir.1997) ("inevitable confusion" revives claim estopped by acquiescence); *SunAmerica Corp. v. Sun Life Assur. Co. of Canada,* 77 F.3d 1325, 1334 (11th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 79, 136 L.Ed.2d 37 (1996) (same). In such cases, revival allows plaintiff to obtain injunctive relief only, not damages. *See Creative Computer Visions, Inc. v. Laser Learning Technologies,* 931 F.Supp. 455, 457 (S.D.W.Va. 1996).

The most recent Second Circuit case dealing with laches in the context of trademark claims, *Conopco, Inc.,* gives this Court some reason to be cautious in its application of the "inevitable confusion" rule. The stated justification for relying on a strong showing of confusion to revive a claim from laches is not the future harm to the senior (first) user of the mark but rather "the public interest in preventing confusion around the marketplace...." *SunAmerica Corp.,* 77 F.3d at 1334. However, the court in *Conopco, Inc.* found that, while "the public interest [in avoiding confusion] must be considered in any application of laches," it was "in no way determinative" to such application except in cases where confusion would raise health and safety concerns. *Id.,* 95 F.3d at 193–94.

On close review of that decision, the Court concludes that it was not intended to foreclose application of a *per se* rule regarding a strong showing of confusion. The Second Circuit in *Conopco, Inc.* confronted only the issue of whether the standard showing of a likelihood of confusion in a misleading advertisement case would be enough to defeat laches. *Conopco, Inc.,* 95 F.3d at 193. Had the Second Circuit followed this reasoning, it would necessarily have found that laches could never apply in such a case. *See Creative Computer Visions, Inc.,* 931 F.Supp. at 458 ("If a likelihood of confusion bars the affirmative defenses of laches, how could those defenses *ever* be asserted to bar injunctive relief given likelihood of confusion is an element of the infringement claim?" (emphasis in original)). The *per se* limit at issue here will override laches only where there is a showing of "inevitable confusion." *Id.; see also* 4 McCarthy, *supra,* § 31.04[1] (*per se* rule applies where use of marks is "clearly confusing"). As there is no evidence that the Second Circuit would adopt a contrary rule, the Court will follow the lead of the Fourth, Seventh and Eleventh Circuits and allow revival of trademark infringement claims on a heightened showing of likelihood of confusion. In this event, plaintiff would still be denied damages but would be entitled to some form of injunctive relief narrowly tailored to address the concern of consumer confusion. *See SunAmerica Corp.,* 77 F.3d at 1336 (" '[t]he equitable relief that is granted should be only that which is required to distinguish the two products, and no more.' " quoting *B.H. Bunn Co. v. AAA Replacement Parts Co.,* 451 F.2d 1254, 1270 (5th Cir. 1971)). However, plaintiff's burden is a heavy one since "inevitable confusion" must be established by "clear and convincing evidence." *Creative Computer Visions, Inc.,* 931 F.Supp. at 458.

 In determining whether plaintiff has satisfied this heightened burden, the Court finds that evidence of actual confusion is critical. Courts do not generally require evidence of actual confusion in order to prove a likelihood of confusion. *Coach Leatherware Co., Inc. v. AnnTaylor, Inc.,* 933 F.2d 162, 170–171 (2d Cir.1991). However, where

the marks have been in use for a substantial period of time, the absence of such evidence is considered "a strong indicator that the likelihood of confusion is minimal." *Plus Products v. Plus Discount Foods, Inc.*, 722 F.2d 999, 1006 (2d Cir.1983) (presumption applied after three-year period). *SunAmerica Corp. v. Sun Life Assurance Co. of Canada*, 890 F.Supp. 1559 (N.D.Ga.1994), cited by plaintiff, is not to the contrary. That case found inevitable confusion based in substantial part on "the proof of actual confusion found in the results of the joint survey." *Id.* at 1580.

Here, the "Harley Rendezvous" name has been used contemporaneously with the Harley–Davidson trademark for over thirteen years. Plaintiff has not provided an affidavit of any person who claims to have been confused with regard to sponsorship. The only evidence pointed to is a declaration by Joyce Splittgerber ("Splittgerber"), the authorized Harley–Davidson dealer who operates close to the area where the Harley Rendezvous is held. Because of the importance of this statement, it is quoted at length:

> Every year, I close my store at noon on the day of the Harley Rendezvous event because I receive so many telephone calls and contacts regarding the event from people who believe that the event is a Harley–Davidson–sponsored event or that the event is sponsored by my dealership. There are a great number of people who believe every year that this event is sponsored by Harley–Davidson or by my dealership. New riders especially believe that this is a Harley Davidson event. Every year, as soon as the promotion for the Harley Rendezvous starts, I get numerous telephone calls from people, particularly people from out of town, asking where they can buy their tickets or how they can buy their tickets or otherwise asking inquiring about the Harley Rendezvous. My phone rings several times a day around the time of the Harley Rendezvous with people calling to ask about the event. This confusion over the sponsorship of the event has occurred every year since the very first year that the Harley Rendezvous was held.

Splittgerber Dec. ¶ 2. As the sole basis for finding actual confusion, the Court concludes that Splittgerber's declaration cannot reasonably be considered "clear and convincing evidence" that there is a mistaken belief of sponsorship. Although she does allege that "[t]here are a great number of people who believe every year that this event is sponsored by Harley–Davidson or by my dealership," this statement is conclusory; it provides no basis for a trier-of-fact to determine whether Splittgerber's belief is accurate or not. Indeed, her assertion that people believe the sponsorship is either Harley–Davidson *or* her dealership suggests that she herself is not sure. The basis of her belief appears to be the fact that numerous people call her asking for information about the Rendezvous. However, this alone is not convincing evidence that those calling think that Harley–Davidson is sponsoring the event. The calls demonstrate no more than that a significant number of people expect that they can obtain information about a large event dedicated to Harley–Davidson riders from a Harley–Davidson dealer in the immediate area. The Court finds that this provides some evidence but not enough to reasonably be considered "clear and convincing" evidence of actual confusion. Therefore, this exception to the laches defense is not applicable in the case at bar. Defendants' motion for summary judgment on plaintiff's federal and state law claims is therefore GRANTED insofar as those claims rest on defendants' use of the name "Harley Rendezvous."

5. *Application to Plaintiff's Other Claims of Infringement*

 In addition to defendants' use of the term "Harley" in "Harley Rendezvous," plaintiff complains that in 1991, it learned that defendants were selling products "with Harley–Davidson's trademarks on them" and were also infringing on other trademarks owned by plaintiff. To the extent that this allegation involves other uses of the term "Harley Rendezvous," it is subject to the same laches analysis given above. However, infringements on other trademarks must be considered separately. Since plaintiff was aware of these infringements only by 1991, no presumption of laches applies. Moreover,

the Court does not find that a delay of less than two years was unreasonable or that defendants have shown any prejudicial reliance on the delay. Defendants' motion for summary judgment on plaintiff's federal and state law claims must therefore be DENIED insofar as those claims rest on alleged uses of Harley–Davidson's trade marks other than the use of "Harley" in the trade name "Harley Rendezvous." [4]

*D. Attorney's Fees*

■ Defendants request attorneys fees pursuant to § 35 of the Lanham Act, which provides that "[t]he court in exceptional cases may award reasonable attorney's fees to the prevailing party." 15 U.S.C. § 1117(a). In order to find that a case is "exceptional" under this provision, defendants must make a showing that plaintiff has acted in bad faith in bringing its suit. *See Conopco*, 95 F.3d at 194–95. The Court finds no evidence, however, that even that portion of plaintiff's claim that is barred by laches was brought in bad faith. Defendants' request for attorney's fees is therefore denied.

*E. Outstanding In Limine Motions*

The Court notes that there are a number of outstanding *in limine* motions made by Harley–Davidson prior to this Court's vacatur of the denial of the motion for summary judgment. Because it is not clear to what extent this intervening decision has changed the issues raised by plaintiff's motions, these motions are DENIED *sua sponte* without prejudice to renew should plaintiff find that appropriate.

For the foregoing reasons, it is hereby

ORDERED that defendants' motion for summary judgment is GRANTED as to all claims with respect to its use of the name "Harley Rendezvous" and DENIED otherwise; and it is further

ORDERED that plaintiff's motion to strike is DENIED; and it is further

ORDERED that plaintiff's four *in limine* motions are DENIED *sua sponte* without prejudice to renew; and it is further

ORDERED that the Clerk serve a copy of this order on all parties by regular mail.

IT IS SO ORDERED.

---

4. The Court notes that defendants emphatically deny the truth of these allegations and assert that there is no evidentiary basis for them in the record. The Court does not now decide whether the allegations have evidentiary support, since the only issue before it is the defense of laches.