**TILLAMOOK COUNTRY SMOKER, INC., an Oregon corporation, Plaintiff,**

v.

**TILLAMOOK COUNTY CREAMERY ASSOCIATION, an Oregon cooperative corporation, Defendant.**

**Civil No. 02–1540–MO.**

United States District Court,
D. Oregon.

April 1, 2004.

Brenna Kristine Legaard, Charles D. McClung, J. Peter Staples, Chernoff, Vilhauer, McClung & Stenzel, LLP, Portland, OR, for Plaintiff.

James C. Edmonds, Clark Lindauer Fetherston Edmonds, Salem, OR, for Defendant.

## OPINION AND ORDER

MOSMAN, District Judge.

This trademark dispute raises issues involving two successful companies' use of the word "Tillamook," the name of the Oregon coastal county where both companies are based. Defendant Tillamook County Creamery Association ("Creamery") has sold dairy products under labels using "Tillamook" for almost 100 years. It, therefore, claims that plaintiff Tillamook Country Smoker ("Smoker") cannot use the word in its packaging for smoked meats. At oral argument the court issued a ruling orally upholding Smoker's right to operate under the name "Tillamook Country Smoker," but prohibiting it from using the phrase "Tillamook Jerky." This opinion sets out the reasons for that ruling in further detail.

## I. BACKGROUND

Creamery is an agricultural cooperative based in Tillamook, Oregon and comprised of 150 members, all of whom are dairy farmers. Creamery was founded almost 100 years ago. It has grown substantially, with annual revenues topping $240 million. Its primary product is cheese; it is second only to Kraft in the sale of certain types of cheeses. It also sells other dairy products including butter and ice cream.

Creamery began using the name "Tillamook" as early as 1918. It obtained federal registrations for the use of "Tillamook" in 1921 and 1950. Creamery has spent millions to promote products labeled "Tillamook."

As it has grown, Creamery has profited handsomely from the licensing of its trade name to businesses including McDonald's, which has started marketing "Tillamook" cheeseburgers. As part of its effort to market its products, Creamery opened a store at its factory along Highway 101 in Tillamook. The store began in a trailer and has grown to become the third largest tourist attraction in the state.

In 1975, a dairy farmer member of Creamery, Crawford Smith, decided to go into the smoked meat business. At that time Art Crossley owned a smoked meat business. Smith approached Crossley about starting a new business. To finance their new endeavor Smith and Crossley approached Creamery members Bud and Helen Gienger who agreed to invest in the new endeavor. Today the same three families—the Smiths, Giengers, and Crossleys—own the business.

As a member of Creamery, Crawford Smith deeply respected the Creamery's general manager, Beale Dixon. Smith, therefore, felt compelled to inform Dixon about his and Crossley's plans to go into the smoked meat business. In the spring

of 1975 Smith told Dixon they planned to call the new business "Tillamook Country Smoker." Smith asked Dixon whether he would object to the use of this name; Dixon responded he would only object if Smith was "going to build a cheese plant." Smith promised he would not build a cheese plant.

Smoker struggled for a number of years; in 1984, however, *Oregon Business* magazine gave Smoker an entrepreneurship award. The magazine observed that from 1982 to 1984 Smoker's plant had doubled in size, employing almost seventy people. The article further observed that, "Initially, distribution was limited to Oregon, Washington, and California, but within the [first] six months [of 1984] boundaries . . . all but disappeared." Smoker began shipping its products throughout the United States and to other countries, including Japan. According to the 1984 article, Smoker's products were available in grocery and convenience stores.

Today, Smoker employs about 250 workers and grosses annually about $41 million in sales. Smoker's total sales over the past twenty-seven years have exceeded $475 million. Beef jerky, pepperoni, and sausages are Smoker's primary products. While Smoker's sales make up only about 2.5% of the national meat snacks market, Smoker is one of, if not the, fastest growing meat snack company in the country. Although precise figures are not offered, Smoker has spent at least $30 million on marketing, promotion, and packaging within the last six or seven years alone.

After Smith's conversation with Dixon in 1975, Smoker designed its first label which prominently featured the words "Tillamook Country Smoker." The word "Tillamook" was the same font size as "Country Smoker." In addition, on both sides of the label, the single word "Tillamook" was listed about twenty times.

Over the years Smoker has used different label designs. The record shows that Smoker has used at least twenty-eight different labels over the years. Smoker, on all the various labels, has used the words "Tillamook Country Smoker." On some of its labels the word "Tillamook" was the same size font as "Country Smoker." However, on several others, the word "Tillamook" was larger than "Country Smoker."

After having used the name "Tillamook Country Smoker" for almost a decade, Smoker decided to register the mark with the federal Trademark Office. In a letter dated January 6, 1985, Smoker informed Creamery it wished to register the name and asked for an affidavit from Creamery stating it did not object to registration of the mark "Tillamook Country Smoker." Although it received the letter, Creamery never responded. Creamery's internal minutes show it decided against granting consent to Smoker, reasoning Creamery may one day wish to expand its product line to include smoked meats.

Finally, in September 1985, Smoker applied for registration of "Tillamook Country Smoker." In November 1985, the Trademark Office ultimately refused to register the name because it was "confusingly similar" to Creamery's registered mark for "Tillamook." The Office's examining attorney concluded Smoker's mark likely would cause consumer confusion; the examiner reasoned that the two companies' goods were complementary, the marks were nearly identical, the channels of trade were the same, and the class of purchasers was the same.

Although it did not obtain a formal registration for "Tillamook Country Smoker" in 1985, Smoker continued to use the mark. Finally, in 1995, Smoker filed a new application with the Trademark Office, seeking to register "Tillamook Coun-

try Smoker and Design"; this application sought to register the words "Tillamook Country Smoker" in connection with a particular label design the parties sometimes refer to as the "ribbon design." The Trademark Office approved this application.

In 1997, as part of its continuing effort to promote its brand name, Smoker hired Michael Strickland to create a more coherent brand image. Studies showed that Smoker had not successfully placed its brand name in consumers' minds. Strickland concluded Smoker had failed properly to emphasize the name "Tillamook Country Smoker." According to Strickland, Smoker had instead been emphasizing the product, which caused consumers to view its products generically. Under Strickland's guidance, Smoker stopped its reliance on the "ribbon design" and instead redesigned its packaging. As shown by Creamery's Exhibits 119 and 126, Smoker's packages now use what the parties call a "circle T" design. In those exhibits, the word "Tillamook" appears in block lettering above, and is larger than, "Country Smoker." Below or to the side of "Tillamook Country Smoker" appears a large "T" with a circle around it. Smoker eventually reduced the font size of "Tillamook" in an effort to negotiate with Creamery regarding its objection to the use of "Tillamook Country Smoker." The discontinued label with "Tillamook" in larger font now represents only about 20% of the existing labels—a number that is in continual decline.

As part of Strickland's strategy to redefine Smoker, Smoker sought to increase its direct sales to major grocery stores and club warehouses. By 1997 only .5% of Smoker's sales were direct sales to such entities. Prior to 1997, it primarily used independent brokers and distributors. In using brokers and distributors, Smoker had less control over the ultimate destination of its products; although Smoker's products sometimes found their way into grocery stores, the brokers and distributors for the most part placed the products in convenience stores and smaller "mom and pop" grocery stores. But by 2002 Smoker's direct sales to main-line grocery stores and club warehouses had significantly increased, although direct sales to such entities still comprised only 17% of Smoker's total sales.

Like Smoker, 1997 was an important year for Creamery's brand strategy. For the first time, in 1997, Creamery conducted an extensive brand-management study. As a result of the study, Creamery hired a brand manager whose job was to protect the word "Tillamook." Near the time of appointing a brand manager Creamery began for the first time keeping a consumer log to track instances of consumer confusion. Also as part of the brand promotion strategy, Creamery began to protest area businesses' use of the word "Tillamook" in their trade names. For example, Creamery objected to a business using the name "Artichokes from Tillamook," a coffee shop's selling "Tillamook coffee," and a bird-feed business's using the name "Tillamook Peanut Bugger."

In 1999 Smoker again sought to obtain formal registration for the words "Tillamook Country Smoker." The Trademark Office ultimately approved Smoker's application. But before the office issued a final registration, Creamery opposed the registration in 2002. In 2002, Creamery also sought to cancel Smoker's 1995 registration for "Tillamook Country Smoker & Design."

Also in 1999 Smoker developed its first website, giving it the domain name "tillamookjerky.com." Smoker also flirted with the idea of mass marketing its products under the name "Tillamook Jerky." Smoker, however, used "Tillamook Jerky"

on product labeling only for a single distribution channel and for a three month period (November 2000 until March 2001). Aside from this three-month period and its website, Smoker has not used the name "Tillamook Jerky."

Creamery's 2002 opposition before the Trademark Office was not representative of its relationship with Smoker over the years. Almost since Smoker's inception, and during its period of growth up until 2002, Smoker and Creamery successfully worked together. Creamery in fact sold Smoker's products in the Creamery factory store and catalog. In 2001, for instance, Creamery bought over $635,000 of Smoker's products for resale. These 2001 sales resulted in a $217,000 profit for Creamery. Creamery's catalog at times would refer to Smoker's products as "our" beef jerky, "our" sausage, and "Tillamook summer sausage." The catalog also included a toll-free number through which customers could buy Smoker's products. In 2000 Creamery developed a company website which described and offered for sale Smoker products.

During this period in which Creamery sold Smoker's products, Smoker employees would visit the Creamery factory store almost every day to replenish the inventory of Smoker products. In addition, at one point, each company sold cheese-and-meat snacks using the other's products. For about ten years, Creamery also allowed Smoker to use Creamery's trucks for shipping its smoked meat products to out-of-state grocery and convenience stores.

Creamery did not expressly object to Smoker's use of the words "Tillamook Country Smoker" until September 2000 when Creamery wrote a cease-and-desist letter objecting to Smoker's use of the word "Tillamook." Creamery's then-president, Harold Schild, negotiated a proposed settlement with Smoker which would have allowed Smoker to continue using the words "Tillamook Country Smoker" as long as Smoker redesigned its packaging. Smoker then reduced the size of the word "Tillamook" on its packaging so the word would be smaller than "Country Smoker." Creamery's board, however, ultimately rejected the proposed settlement; the board insisted that Smoker entirely stop using the word "Tillamook." Nonetheless, as already indicated, for at least the next two years, Creamery continued to market Smoker's products.

Creamery has reasoned that it waited until 2000 to object to Smoker's use of "Tillamook" because not until about that time did Creamery begin receiving significant correspondence showing consumers were confused about whether Creamery manufactures Smoker's products. According to Creamery, the company received only two consumer contacts in 1998 and 1999 indicating confusion. In 2000, Creamery contends, it received 48 such contacts; in 2001, it received 93 contacts while in 2002 the number grew to 106. Notably, however, the significant increase in contacts indicating confusion occurred at about the time Creamery put up a website for the first time. As a result of the website it appears total consumer contacts increased as well. Moreover, Creamery's brand manager, Kathy Holstad, acknowledged that many of the contacts at issue included customers following up on purchases of Smoker products they had made at the Creamery factory store or through the Creamery catalog.

Finally, in April 2002, Creamery sent a letter to its patrons informing them that Creamery's legal counsel was preparing a lawsuit against Smoker. As a preemptive strike, Smoker filed this lawsuit in September 2002, seeking declaratory relief.

Smoker's complaint seeks a judgment declaring that:

- Smoker is the owner of the trademark "Tillamook Country Smoker" for processed meats and nuts, and its use of those marks for those products does not infringe Creamery's rights in "Tillamook" for dairy products;
- Smoker's U.S. Trademark Registration No. 2,031,877 for "Tillamook Country Smoker" is valid; and
- Smoker is entitled to issuance of a U.S. Trademark registration for the trademark "Tillamook Country Smoker" for processed meats.

In addition, Smoker asserted the following "claims for relief": promissory estoppel, estoppel by acquiescence, and estoppel by laches.

In response Creamery answered and asserted counterclaims. Creamery counterclaimed under the Lanham Act, alleging Smoker's trademarks constituted infringement and use of a false designation of origin. Creamery also asserted claims for dilution under federal and Oregon law. In addition Creamery brought a state law claim for unfair competition based on Smoker's alleged infringement.

Creamery seeks an injunction preventing Smoker from: directly or indirectly using the name "Tillamook" or any other mark, word, or name similar to Creamery's marks which is likely to cause confusion. In addition, Creamery asks the court to enter an order invalidating Smoker's trademark registration applications with the Trademark Office. Creamery further seeks an order declaring that Smoker is not the owner of the mark "Tillamook Country Smoker" and that its use infringes Creamery's trademark rights. Creamery also wants an order holding Smoker's use of the mark "Tillamook Jerky" and domain name "Tilla-

mookJerky.com" infringes Creamery's rights.

In reply to Creamery's counterclaims Smoker asserted the affirmative defenses of promissory estoppel, estoppel by acquiescence, and estoppel by laches.

Both parties have filed motions for summary judgment. Creamery filed a motion for summary judgment or partial summary judgment. It moved for judgment on the following issues: (1) whether Smoker is entitled to a declaration of non-infringement, (2) whether Smoker is entitled to federal trademark registration of the words "Tillamook Country Smoker," and (3) whether Smoker is entitled to rely on the theories of promissory estoppel, estoppel by laches, and estoppel by acquiescence.

Smoker moved for a partial summary judgment. Smoker seeks partial summary judgment on the three doctrines of promissory estoppel, acquiescence, and laches and, therefore, an order allowing Smoker to continue using the words "Tillamook Country Smoker."

For the reasons discussed below, the court grants partial summary judgment in favor of Smoker, because laches bars Creamery from objecting to Smoker's use of "Tillamook Country Smoker." The court, however, also grants partial summary judgment in favor of Creamery to the extent it seeks a declaration that Smoker's use of "Tillamook Jerky" is infringing.[1]

## II. STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(c) the party moving for summary judgment carries the burden of establishing that no genuine issue of material fact ex-

---

1. The court has ordered further briefing on the issues involving registration of the marks at issue in the Trademark Office. According-

ly, this opinion does not decide the issues involving registration.

ists and that it is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the movant meets this burden, the opposing party must go beyond the pleadings and "by its own evidence set forth specific facts showing that there is a genuine issue for trial." *Far Out Productions, Inc. v. Oskar,* 247 F.3d 986, 997 (9th Cir.2001). A fact is material when the applicable substantive law identifies the fact as critical to the case's outcome. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). At the summary judgment stage a district court must not weigh conflicting evidence, and all justifiable inferences must be viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

While the fact-specific nature of trademark disputes generally makes summary judgment inappropriate, see *Entrepreneur Media, Inc. v. Smith,* 279 F.3d 1135, 1140 (9th Cir.2002), summary judgment nonetheless is appropriate when "there is no genuine issue as to material facts and the moving party is entitled to judgment as a matter of law." *Levi Strauss & Co. v. GTFM, Inc.,* 196 F.Supp.2d 971, 974 (N.D.Cal.2002) (citing Fed.R.Civ.P. 56); see also *Brother Records, Inc. v. Jardine,* 318 F.3d 900, 903 (9th Cir.2003) (observing that summary judgment is appropriate in a trademark-infringement case when " 'no genuine issue exists regarding likelihood of confusion' ") (quoting *Thane Int'l, Inc. v. Trek Bicycle Corp.,* 305 F.3d 894, 901 (9th Cir.2002)); *American Int'l Group, Inc. v. American Int'l Bank,* 926 F.2d 829, 831 (9th Cir.1991) (noting, in trademark case, that a "district court may properly grant summary judgment on the basis of laches").

## III. "TILLAMOOK COUNTRY SMOKER"

As mentioned, Smoker relies on three separate equitable doctrines—laches, acquiescence, and promissory estoppel—to support its position that it may continue to use "Tillamook Country Smoker." Because the court holds that laches applies in favor of Smoker, the court need not discuss the other two doctrines.

■ It is "well established that laches is a valid defense to Lanham Act claims." *Jarrow Formulas, Inc. v. Nutrition Now, Inc.,* 304 F.3d 829, 835 (9th Cir.2002); see also *GoTo.Com, Inc. v. Walt Disney Co.,* 202 F.3d 1199, 1209 (9th Cir.2000) ("we have certainly allowed laches to bar trademark infringement cases...."). Laches rests on the "maxim that one who seeks the help of a court of equity must not sleep on his rights." *Jarrow Formulas,* 304 F.3d at 835 (citation omitted). Laches essentially applies to prevent plaintiffs from gaining "the unfair advantage of hindsight, while defendants suffer the disadvantage of an uncertain future outcome." *National Ass'n for the Advancement of Colored People v. NAACP Legal Defense & Educational Fund, Inc.,* 753 F.2d 131, 137 (D.C.Cir.1985). To establish laches a party must show that (a) the claimant unreasonably delayed in filing suit, and (b) as a result of the delay, the party suffered prejudice. *Danjaq LLC v. Sony Corp.,* 263 F.3d 942, 955 (9th Cir.2001). The Ninth Circuit has directed courts considering a laches defense to a trademark claim also to evaluate other factors including: the harm to the senior user if relief is denied, whether the junior user acted in good faith ignorance of the senior user's rights, and the degree of competition between the senior and junior users. *E–Systems, Inc. v. Monitek, Inc.,* 720 F.2d 604, 607 (9th Cir. 1983). While a court is guided by various factors, ultimately, the doctrine of laches

requires " 'a consideration of the circumstances of each particular case and a balancing of the interests and equities of the parties.' " *ProFitness Physical Therapy Ctr. v. Pro–Fit Orthopedic & Sports Physical Therapy, P.C.*, 314 F.3d 62, 67 (2d Cir.2002) (quoting *Carl Zeiss Stiftung v. VEB Carl Zeiss Jena*, 433 F.2d 686, 703 (2d Cir.1970)).

As an initial point, some courts have held that although laches precludes a plaintiff from recovering damages, it does not bar injunctive relief. See, e.g., *Kellogg Co. v. Exxon Corp.*, 209 F.3d 562, 568 (6th Cir.2000). To bar injunctive relief these courts require a showing of "acquiescence," rather than laches. See, e.g., *id.* at 568–69.[2] The parties in the case at bar, however, do not contend that the doctrine of laches is inapplicable because Creamery seeks only injunctive relief. In any event, the Ninth Circuit expressly has recognized that laches may be applied even when a Lanham Act claimant seeks prospective injunctive relief. See, e.g., *Jarrow Formulas*, 304 F.3d at 840; *Prudential Ins. Co. of Am. v. Gibraltar Fin. Corp. of Cal.*, 694 F.2d 1150, 1152 n. 1 (9th Cir.1982). As long as the party opposing an injunction would "be prejudiced by a prospective injunction" a court may apply laches. *Jarrow Formulas*, 304 F.3d at 840.

### A. Objections to "Tillamook Country Smoker"

■ The Lanham Act does not have its own statute of limitations. Thus, the Ninth Circuit has reasoned, courts should be guided by "the limitations period from the most closely analogous action under state law." *Jarrow Formulas*, 304 F.3d at 836. The reasonableness of the claimant's delay is, therefore, considered in light of the time allotted by the analogous limitations period. *Id.* at 837. When a claim is "filed after the analogous limitations period has expired, the presumption is that laches is a bar to suit." *Id.*

■ As the analogous state limitations period Smoker identifies Oregon's general two-year tort limitations period. See ORS 12.110(1). Acknowledging Creamery also alleges intentional infringement, Smoker suggests Oregon's ten-year period of "ultimate repose" may also apply. See ORS 12.115(1). Creamery does not take issue with Smoker's invoking the two-year or ten-year periods.

The parties, however, dispute when the period of delay should begin to be measured. Smoker says the delay exceeds twenty years, tracing the delay back to 1975 when Crawford Smith approached Beale Dixon about using the phrase "Tillamook Country Smoker." Thus, Smoker argues, the delay far exceeded even a ten-year limitations period and was therefore presumptively unreasonable.

According to Creamery, Smoker cannot invoke its equitable defense unless Smoker first establishes its *infringing* use of the Tillamook mark. See Creamery's Response to Plaintiff's Motion for Partial Summary Judgment at 4 (citing *GoTo. Com, Inc.*, 202 F.3d at 1209) (stating party invoking doctrine of laches must show complaining party "allowed the *infringing mark* to be used without objection for a long period" (emphasis added)). In sum Creamery argues that Smoker, as the party invoking laches, must affirmatively show

---

**2.** The doctrines of laches and acquiescence are similar in that both require a showing of unreasonable delay and prejudice. See *Kellogg Co.*, 209 F.3d at 569. Acquiescence, however, implies active consent, while laches implies merely passive consent. See *Sara Lee Corp. v. Kayser–Roth Corp.*, 81 F.3d 455, 462 (4th Cir.1996). Although the circumstances presented in this case also may fit an acquiescence analysis, the court, as mentioned, need not decide whether Creamery's objections are barred by acquiescence, since laches applies.

that it was infringing Creamery's trademark rights.

The court rejects Creamery's argument that a party invoking laches has the burden of establishing infringement. When, as here, the party resisting the application of laches has asserted an infringement claim against the party invoking laches, the court should focus on the conduct which the claimant contends infringes. The underlying rationale for laches is to prevent a party from sleeping on its rights; accordingly, a party cannot sue claiming conduct X is infringement when conduct X has been occurring for many years with the party's knowledge. Requiring Smoker to admit infringement—and, therefore, concede liability as to Creamery's counterclaim—would render the laches defense "spineless." *Jarrow Formulas,* 304 F.3d at 840 (indicating courts must be careful not to define laches in such a way as to "render it a spineless defense" (citation omitted)). In any event, the Ninth Circuit has indicated, in the context of discussing unreasonable delay, that courts should focus on the conduct upon which the claimant bases its infringement claim: "the relevant delay is the period from when the plaintiff knew (or should have known) of the *allegedly* infringing conduct." *Danjaq LLC,* 263 F.3d at 952 (emphasis added); see also *Nartron Corp. v. STMicroelectronics, Inc.,* 305 F.3d 397, 408 (6th Cir.2002) ("The period of delay begins to run when plaintiff had actual or constructive knowledge of the *alleged* infringing activity." (citation omitted) (emphasis added)).

At the outset, therefore, the conduct which Creamery claims is infringement should be examined. The core of Creamery's infringement claim is Smoker's use of the trade name "Tillamook Country Smoker" to sell smoked meats. Under the circumstances of this case, Smoker's use of the name "Tillamook Country Smoker" is a gift of time.

Going back to 1975, Creamery's general manager, Beale Dixon, expressly stated he did not object to the use of the name, as long as Smoker did not build a cheese factory. Thus it cannot be said Smoker acted in bad faith in adopting the name "Tillamook Country Smoker." Dixon's express assurance is even aside from the fact the two companies operate from the same geographic area. Creamery, therefore, has known about, and even affirmatively consented to, Smoker's use of "Tillamook Country Smoker."

In addition Smoker's *first* logo, adopted in 1976, emphasized "Tillamook Country Smoker." In fact, for almost thirty years now, Smoker's logos have displayed prominently the words "Tillamook Country Smoker."

Moreover, since its inception in 1975, Smoker has been selling meat snacks. Also, for years, Smoker's products have been marketed in the same channels used by Creamery; both companies, for example, have used Creamery's factory store and catalog to peddle their respective products. In short, the facts forming the crux of Creamery's infringement claim against Smoker have existed for almost thirty years. Nevertheless Creamery remained silent.

The unreasonableness of Creamery's delay is further underscored by the nature of the two companies' past relationship. Creamery marketed Smoker's products for years, using Creamery's factory store, catalog, and then website. In fact, even after 1997 (when Smoker adopted the circle T packaging design) Creamery continued to sell Smoker's products, earning a profit of over $200,000 on the sale of Smoker products in 2001 alone. It would be inequitable to permit Creamery to profit from the sale of "Tillamook Country

Smoker" branded products, all the while withholding any objection to the use of that name.

Moreover the court further notes that the parties agree that Smoker's meat snacks do not directly compete with Creamery's products, but instead are "complementary" to Creamery's cheese products. As explained by Judge Hand, when an alleged infringer is selling products which are complementary, but not in direct competition, to those sold by the trademark owner,

> The owner's only interest in preventing such a use of his mark is because he may wish to preempt the market for later exploitation, or not to expose his reputation to the hazard of the newcomer's business practices, or both.... [T]hese interests yield much more readily to any conflicting interests of the newcomer than when he invades an existing market.... The owner's rights in ... appendant markets are easily lost; they must be asserted early, lest they be made the means of reaping a harvest which others have sown.

*Dwinell–Wright Co. v. White House Milk Co.*, 132 F.2d 822, 825 (2d Cir.1943); see also *E–Systems, Inc.*, 720 F.2d at 607 (listing as a factor to consider the "competition between senior and junior users").

In short, Creamery's delay in objecting to the use of the name "Tillamook Country Smoker" was unreasonable.

## B. Progressive Encroachment

Creamery, however, argues that its delay in filing this lawsuit is not unreasonable under the doctrine of progressive encroachment. It argues that laches does not apply because it had no obligation to object to the use of "Tillamook Country Smoker" until Smoker began using the circle T package design in 1997 and began more aggressively marketing its meat products through direct sales to grocery and club-warehouse stores. Thus, apparently recognizing that Smoker's use of "Tillamook Country Smoker" has been continuous since about 1975 and thus implicates laches, Creamery attempts to move the starting point for the laches analysis up to 1997 at the earliest.

At the outset, the court notes that Creamery's briefing presumes that progressive encroachment would allow it to prevent entirely the use of the name "Tillamook Country Smoker." But even if progressive encroachment were to apply in favor of Creamery, the doctrine could at most prohibit Smoker from using the name in connection with the circle T package design and directly selling its products to grocery and warehouse stores. See, e.g., *President & Fellows of Harvard Coll. v. Harvard Bioscience, Inc.*, 204 F.Supp.2d 134, 136–37 (D.Mass.2002) (reasoning that Harvard College could not object to a company's use of "Harvard" when the College knew about the use for almost 100 years but could object only to the company's use of "Harvard" in connection with a recently adopted logo resembling the College's logo). In any event, for the reasons discussed below, the court holds that the progressive-encroachment doctrine does not excuse Creamery's delay.

Progressive encroachment is an "offensive countermeasure" to the affirmative defense of laches. *Kellogg Co.*, 209 F.3d at 571. The doctrine operates to give a trademark owner "some latitude in the timing of its" objecting to alleged infringement. *Id.* at 570. It allows the trademark owner to "demonstrate that although it might have been justified in bringing suit earlier but did not, certain factors now exist that have prompted it to do so." *Id.* Courts developed the doctrine to alleviate the dilemma trademark owners often face: whether to sue as soon as it learns about possible infringement and thereby risk suing prematurely, or delay filing suit and

thereby risk being subject to a laches defense. McCarthy on Trademarks § 31.21.

At the same time, however, a trademark owner should not be permitted merely to stand aside and watch the alleged infringer's business "grow at great cost." *Dwinell–Wright Co.*, 132 F.2d at 825 (Hand, J.); see also *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 823 (7th Cir.1999) (" 'It cannot be equitable for a well-informed merchant with knowledge of a claimed invasion of right, to wait to see how successful his competitor will be and then destroy with the aid of court decree, much that the competitor has striven for and accomplished.' ") (quoting *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 498 (2d Cir.1961)). When a trademark owner, aware of a newcomer's use of the mark at issue, fails affirmatively to object to the use, the newcomer often may reasonably conclude that the owner in fact does not object, thereby encouraging the newcomer to build upon that assurance. *Dwinell–Wright Co.*, 132 F.2d at 825. In fact, "the increase in the scope of the defendant's business is one of the very factors typically required in order for it to show prejudice, one of the elements" of a laches defense. *Johnny's Fine Foods, Inc. v. Johnny's, Inc.*, 286 F.Supp.2d 876, 885 (M.D.Tenn. 2003).

■ Accordingly the progressive-encroachment doctrine "requires something about the defendant's use of the mark to have changed significantly." *Nartron Corp.*, 305 F.3d at 410; see also Callman on Unfair Competition, Trademarks & Monopolies § 23:23 ("the progressive encroachment argument fails where there has been no substantial change in the defendant's conduct or the plaintiff's situa-

tion."). Several courts have found the guiding question in an encroachment analysis to be whether the defendant has directed " 'its marketing or manufacturing efforts' " in such a way that the defendant is " 'placed more squarely in competition with the plaintiff.' " *Chattanoga Mfg., Inc. v. Nike, Inc.*, 301 F.3d 789, 794 (7th Cir. 2002) (quoting *Kason Indus., Inc. v. Component Hardware Group, Inc.*, 120 F.3d 1199, 1205 (11th Cir.1997)); accord *Kellogg Corp.*, 209 F.3d at 570. The Ninth Circuit, for example, refused to apply progressive encroachment where the junior and senior users did not "offer the same services to any substantial extent" and thus the junior user had not moved "into direct competition" with the senior user. *Prudential Ins. Co. of Am.*, 694 F.2d at 1154.

The encroachment analysis, therefore, at bottom requires a comparison of the changes in the mark's use comprising the alleged encroachment and the prior use. See *ProFitness Physical Therapy*, 314 F.3d at 70. If the alleged changes in use are insubstantial in the sense that the claimant could have made its case for likelihood of confusion before the changes, progressive encroachment should not apply. Under this analysis, if the alleged changes in use are better characterized as merely changes "of degree, not of kind," the claimant's delay in filing suit is not forgiven. *Johnny's Fine Foods*, 286 F.Supp.2d at 884. As a corollary, growth arising out of consistent reliance on the same general business model does not support applying progressive encroachment. See *Prudential Ins. Co. of Am.*, 694 F.2d at 1154 (declining to find encroachment, even though junior user had "grown tremendously," because "growth alone does not infringement make").[3] Requiring a sig-

---

3. See, e.g., *H.G. Shopping Ctrs. L.P. v. Birney*, 2000 WL 33538621, 59 U.S.P.Q.2d 1109, 1117–18 (S.D.Tex.2000) (declining to find encroachment as to dilution claim where defendant renovated its apartment building from a

low-end residence to a higher-end one, because defendant had offered the "same category of services" and used the mark at issue for more than twenty years); *Manganaro*

nificant change, rather than merely business growth, to support encroachment reduces the risk of encroachment arguments based on " 'nothing more than a *post hoc* rationalization for unreasonable delay.' " *Chattanoga Mfg.*, 301 F.3d at 794 (quoting *Hot Wax*, 191 F.3d at 823).

■ With these principles in mind, the court turns to Creamery's claim of progressive encroachment. As mentioned Creamery argues that two events excuse its delay in filing this lawsuit: (1) Smoker sometime in 1997 adopted the circle T design for its packaging, and (2) Smoker began more aggressively selling its products directly to major retailers.

The change in packaging does not excuse Creamery's delay. Since 1976 Smoker has used various labels, all emphasizing the name "Tillamook Country Smoker." On several of the prior labels, in fact, the word "Tillamook" is larger than "Country Smoker." The new packaging design also emphasizes the entire phrase "Tillamook Country Smoker," in a uniform font; the design's addition of a "T" with a circle around it does not in any way make the new packaging more similar to Creamery's packaging. Indeed Creamery has not argued that the circle T logo itself is confusingly similar to Creamery's logo. In sum Creamery's encroachment argument cannot rest on Smoker's change in packaging. See, e.g., *Prudential Ins. Co. of Am.*, 694 F.2d at 1154 ("Inspection of the marks ... fails to show increasing similarity between Prudential and Gibraltar logos.").

■ Nor do Smoker's direct sales to retailers excuse Creamery's delay. Al-

though it appears that before the late '90s Smoker's products primarily were sold in convenience stores, the record also shows that since the company's inception, and at least since 1984, Smoker's products have also been found in grocery stores. See Legaard Decl. Ex. 9 (*Oregon Business Journal* article); see also Helen Geinger Dep. at 27 (testifying that Smoker products were in Oregon grocery stores in 1976). The fact the products were placed in grocery stores mainly by independent distributors, rather than through direct sales to retailers' corporate headquarters, is not material; it is doubtful consumers would care how the products found their way into the stores. The increase in grocery-store sales amounts to no more than business growth, an insufficient basis upon which to rest a finding of progressive encroachment.

Moreover, even assuming that grocery stores only began selling Smoker products in about 1997, the change would not support encroachment in this case. Since Smoker was founded, Creamery has worked closely with Smoker to promote its products. Thus Smoker's meat products have been sold in the same channels as Creamery's dairy products for almost thirty years. Indeed Creamery marketed Smoker's products in the Creamery factory store and catalogs. Shelves in grocery stores merely are an *additional* venue at which consumers may encounter both Smoker's meat snacks and Creamery's cheese. Moreover there are no allegations that Smoker has introduced dairy products. Smoker, therefore, has not "brought

*Foods, Inc. v. Manganaro's Hero–Boy, Inc.*, No. 01–Civ.–0849, 2002 WL 1560789, at *9 (S.D.N.Y. July 15, 2002) (declining to find encroachment where restaurant recently had expanded its menu to offer additional foods because it had "publicly engaged in all of the general activities complained of"); *Trustees of Columbia Univ. v. Columbia/HCA Healthcare Corp.*, 964 F.Supp. 733, 752 (S.D.N.Y.1997) (declining to find encroachment—even though rapidly growing hospital used the mark at issue to "rename its growing list of hospitals"—because its use of the name already had been prominent and national for years).

itself *more* squarely into competition" with Creamery. *Kellogg Co.,* 209 F.3d at 573 (emphasis added). Instead the fundamental nature of the relationship between Smoker and Creamery has not changed. Under the circumstances of this case, a move into major retailers would not show that Smoker's "activities have changed so substantially or qualitatively" as to render Creamery's delay excusable. *Manganaro Foods,* 2002 WL 1560789 at *9. Smoker's taking advantage of the expanded markets created by major retailers is best viewed as merely a natural and foreseeable evolution of its business, and thus as insufficient grounds to support Creamery's encroachment argument. Cf. *Prudential Ins. Co. of Am.,* 694 F.2d at 1154–55.

In light of the equitable origin of the doctrines of laches and encroachment, the court further notes that closing the door to major retailers possibly would leave Smoker a victim of external business forces and a vastly shrinking market for its products. It appears the only way for companies today to get their products on the major retailers' shelves is through direct sales. In addition, as Creamery's briefing points out, small stores are a dying breed, thanks to consolidation efforts by national chains. Given these circumstances, the court is particularly hesitant to accept Creamery's encroachment argument.

Furthermore the cases upon which Creamery relies do not support its encroachment argument. Rather, those cases merely underscore the requirement of a significant departure from the prior use of the mark, such as using the mark to sell an entirely new product or making changes to the mark so it is more similar to a competitor's mark. For example, in *Kellogg Co. v. Exxon Corp.,* 209 F.3d 562, Kellogg sued Exxon when Exxon began using its cartoon tiger, not only to market petroleum products, but also to market food and beverages in convenience stores. The Sixth Circuit applied progressive encroachment, reasoning that the "point at which Exxon established itself in th[e] non-petroleum market was" the earliest point at which Kellogg should have known it had a colorable infringement claim. *Id.* at 574. Thus, unlike the case at bar, *Kellogg* involved a company using a mark to enter an entirely new product market. See *id.;* see also *Westchester Media v. PRL USA Holdings, Inc.,* 214 F.3d 658, 668 (5th Cir. 2000) (applying encroachment where a company's new magazine was "not a continuation" of the old magazine but was "in fact a different entity").

Creamery further relies on an old Ninth Circuit decision, *National Van Lines v. Dean,* 237 F.2d 688 (9th Cir.1956), in which the court excused a company's delay in filing suit. But in that case, the alleged infringer significantly changed his logo, creating "a striking similarity of the distinctive features of the two service marks" at issue. *Id.* at 691–92. Moreover the defendant changed the scope of its business from plaintiff's local agent to plaintiff's nationwide, direct competitor. *Id.* at 691. The court thus found a compelling inference that defendant had adopted his mark intentionally "to confuse and deceive prospective customers and thereby accomplish a transfer of business and good will." *Id.* at 692. In contrast, Smoker—which is not a direct competitor to Creamery—adopted "Tillamook Country Smoker" in 1975 only after expressly asking for Creamery's consent.

At oral argument, Creamery relied heavily on *Sara Lee Corp. v. Kayser–Roth Corp.,* 81 F.3d 455 (4th Cir.1996). That case, too, fails to support Creamery's claim of encroachment. In *Sara Lee* plaintiff and defendant were direct competitors in the market for pantyhose. Sara Lee sued after Kayser–Roth moved its "Leg Looks"

products from upscale department stores to lower-end stores such as Wal–Mart and K–Mart. *Id.* at 459–61. Sara Lee's "L'eggs" products were available only in the lower-end stores and never had been available in upscale department stores. *Id.* at 461–62. Thus, when Kayser–Roth began marketing "Leg Looks" in the lower-end stores, the two products were in direct competition in the same venue for the first time. The court, therefore, applied progressive encroachment to forgive Sara Lee's delay in filing suit. See *id.* at 462 ("Because L'eggs(R) hosiery was, then as now, sold exclusively in [Wal–Marts and K–Marts], it is doubtful that Sara Lee could have proved that its product would likely be confused with Kayser–Roth's."). In contrast to *Sara Lee,* Smoker and Creamery are not direct competitors. And unlike *Sara Lee,* Smoker's products have appeared under the same roof as Creamery's for almost thirty years.[4]

The case at bar is more similar to another Fourth Circuit case cited in *Sara Lee.* In *Ambrosia Chocolate Co. v. Ambrosia Cake Bakery,* 165 F.2d 693, 694–95 (4th Cir.1947), the court held that laches, as well as acquiescence, barred the infringement claim because the plaintiff had encouraged defendant to market its products together with plaintiff's. Both companies' product names included the word "Ambrosia." Given plaintiff's "active encouragement and commercial urging" inducing defendant to market products under the "Ambrosia" name, the court held that plaintiff was "estopped from destroying [defendant's] business by an injunction which would forbid the use of the name 'Ambrosia.'" *Id.* at 695. As in *Ambrosia Chocolate,* the prior business dealings be-

tween Smoker and Creamery gave rise to Creamery's "impliedly consenting" to Smoker's use of "Tillamook Country Smoker." *Sara Lee,* 81 F.3d at 461 n. 8.

In summary, unlike the cases upon which Creamery relies, Creamery's counterclaim effectively is "the same trademark infringement case it had" well over ten years ago. *Chattanoga Mfg.,* 301 F.3d at 794. In fact, in 1985, the Trademark Office rejected Smoker's attempt to register "Tillamook Country Smoker." The Office reasoned that a "likelihood of confusion" existed because the phrase was "confusingly similar" to Creamery's registered mark. The examining attorney further reasoned that Smoker's meat snacks and Creamery's cheese were complementary products whose purchasers came from the same general class. The Office additionally concluded that the two products were distributed through the same channels of trade. Despite the longstanding relationship between Creamery and Smoker as described in the Office's findings and Smoker's 1986 correspondence to Creamery seeking permission to register "Tillamook Country Smoker," Creamery never filed suit or otherwise objected.

Progressive encroachment does not apply to forgive Creamery's delay in filing this lawsuit; thus, the laches doctrine's unreasonable-delay element is satisfied.

### C. Prejudice

■ In addition to unreasonable delay, a party invoking laches also must show that the delay caused the party to suffer prejudice. "The very purpose of laches as an equitable doctrine—and the reason that it differs from a statute of limitations—is

---

4. The court also notes that when Kayser's "Leg Looks" hosiery was available only in upscale department stores, sales were dropping "precipitously." *Sara Lee,* 81 F.3d at 461. Thus Sara Lee was faced with the choice of filing a lawsuit regarding a product which might soon disappear from the market. In comparison, the record indicates that Smoker has been steadily accumulating goodwill and growing since the '70s.

that the claim is barred because the plaintiff's delay occasioned the defendant's prejudice." *Danjaq LLC,* 263 F.3d at 955.

There are two primary forms of prejudice in the laches context, evidentiary and economic. *Id.* Evidentiary prejudice occurs when a party's defense is prejudiced because of lost or stale evidence. *Id.* Although Smoker does not expressly rely on evidentiary prejudice, it is notable that Beale Dixon, who assured Crawford Smith that Creamery would not object to the use of "Tillamook Country Smoker," is no longer alive. See *id.* at 956 ("Regarding the availability of witnesses, the inquiry is not whether *some* witnesses might be available—it is whether the absence of *other* witnesses (who will be absent because of [claimant's] delay) will prejudice [defendant].").

In any event, economic prejudice is apparent in this case. Since its inception, Smoker has spent millions of dollars in promotional activities in an attempt to create a favorable brand image for the name "Tillamook Country Smoker." These expenditures only increased as the years wore on and Creamery's silence grew more deafening. Creamery emphasizes that Smoker merely could drop the word "Tillamook" from its packaging and that Smoker, at least up until 1997, failed to create any brand equity. The cases, however, generally find prejudice when the defendant actually spent money promoting its brand name; the focus is not on whether the efforts were completely successful. See, e.g., *Danjaq LLC,* 263 F.3d at 956 ("Danjaq presented uncontested evidence that it invested approximately 'one billion dollars' [in marketing efforts]."); *Jarrow Formulas,* 304 F.3d at 840 (finding prejudice where alleged infringer has "always prominently displayed the [language at issue] on [its] product label" and has spent "hundreds of thousands of dollars per year" in marketing efforts); *Bridge-*

*stone/Firestone Research, Inc. v. Automobile Club De L'Ouest De La France,* 245 F.3d 1359, 1363 (Fed.Cir.2001) ("Economic prejudice arises from investment in and development of the trademark, and the continued commercial use and economic promotion of a mark over a prolonged period adds weight to the evidence of prejudice."); *Hot Wax,* 191 F.3d at 824 ("The market position pursued by [the defendant] with respect to the products at issue was uncontested by [the plaintiff] for years and courts have held that investments to exploit such a position are sufficient prejudice to warrant the application of the doctrine of laches."). If Creamery had filed suit sooner, Smoker "could have invested its resources in shaping an alternative identity" for its smoked meats in the "minds of the public." *Jarrow Formulas,* 304 F.3d at 839. Moreover, even focusing on the 1997 packaging redesign (as Creamery does), Creamery acknowledges the success Smoker has had in recent years. At the very least, from 1997 through the present, Smoker has spent millions to promote the name "Tillamook Country Smoker," thus occasioning substantial goodwill for Smoker. See, e.g., *Harley–Davidson, Inc. v. Estate of O'Connell,* 13 F.Supp.2d 271, 282 (N.D.N.Y.1998) ("The Court concludes that prejudice may be found where defendants have built up a valuable association between the name and their business on which they will continue to rely to attract customers...."). To divest Smoker of its trade name after years of an intensive campaign to develop the name would require Smoker's entire selling organization to be "recast" and its market to be "re-educated." *Landers, Frary, & Clark v. Universal Cooler Corp.,* 85 F.2d 46, 49 (2d Cir.1936) (Hand, J.). It is difficult even to "estimate what the losses may be." *Id.*

Smoker, therefore, has carried its burden to establish conclusively its affirmative defense of laches.

## D. Inevitable Confusion

■ Nevertheless, as Creamery correctly recognizes, the court must consider the effect denying injunctive relief would have on the public interest. See *Jarrow Formulas*, 304 F.3d at 840 ("Because laches is an equitable remedy, laches will not apply if the public has a strong interest in having the suit proceed."). Specifically Creamery invokes the "inevitable confusion" doctrine, an offensive countermeasure to laches and acquiescence requiring a consideration of the public interest. Under the doctrine, an injunction will issue when there is a "particularly strong showing of a likelihood of confusion." *Harley–Davidson*, 13 F.Supp.2d at 285; *Sara Lee Corp.*, 81 F.3d at 463 ("The defense of laches is trumped by a strong showing of likely confusion of the public." (citation omitted)); *Johnny's Fine Foods*, 286 F.Supp.2d at 887 ("the inquiry . . . is not whether such confusion is possible or even likely, but whether it is inevitable."). As the inevitable-confusion doctrine requires a more searching inquiry than the basic likelihood-of-confusion inquiry, a party relying on the doctrine bears a "heavy" burden. *Harley–Davidson*, 13 F.Supp.2d at 285.

Moreover several courts have indicated that doctrines based on a consideration of the public interest should be carefully confined when public safety is not at issue. For example, the Second Circuit has reasoned that although courts must consider the public interest, it is "in no way determinative" of the application of laches unless any confusion or deception would implicate health and safety concerns. *Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187, 193–94 (2d Cir.1996). Although *Co-*

*nopco, Inc.* involved a false-advertising claim, the court noted that the public interest implicated by false advertising is "identical to the public's interest in protecting against trademark infringement." *Id.* While it does not appear that the Ninth Circuit has considered the inevitable-confusion doctrine in the trademark context, the court has broadly reasoned that the public interest should not be given undue weight in Lanham Act cases:

> [I]n order to ensure that laches remains a viable defense to Lanham Act claims, the public's interest will trump laches *only* when the suit concerns allegations that the product is harmful or otherwise a threat to public safety and well being.

*Jarrow Formulas*, 304 F.3d at 841 (emphasis added). Creamery does not make the case that Smoker's use of "Tillamook Country Smoker" somehow risks public safety or well-being.

In any event, even considering Creamery's evidence of confusion, the court concludes that Creamery does not make the necessary strong showing of *inevitable* confusion. The court recognizes that Creamery has introduced evidence of actual confusion showing that consumers mistakenly have assumed that it makes Smoker's products. Ordinarily such evidence of actual confusion would go a long way in establishing inevitable confusion. Cf. *Harley–Davidson*, 13 F.Supp.2d at 285 (noting that "evidence of actual confusion is critical" in showing inevitable confusion). However it is much less persuasive under the circumstances of this case. A review of much of Creamery's evidence indicates that consumers' assumptions often were based on the fact the consumers had seen Smoker's products in Creamery's factory store or catalogs.[5] In fact Creamery's ca-

---

**5.** For instance, Creamery emphasizes a letter it received which was signed by thirty-three parents and educators who were complaining about Smoker's "jerky chew" product (made to resemble chewing tobacco). On its face the letter is persuasive evidence of consumer confusion caused by Smoker's use of the word

talogs sometimes referred to Smoker's products as "our" products or "Tillamook" products. The record also indicates that since Creamery stopped selling Smoker's products incidents of consumer confusion have been declining. See, e.g., Legaard Decl. ¶ 2. In light of Creamery's long history of selling Smoker products, Creamery's brand manager, in fact, conceded that the evidence may show only "potential," rather than "actual," confusion. See Holstad Dep. at 305–06; see also Dinsdale Dep. at 108–09 (Creamery's VP for sales, testifying that "I think potentially there was confusion all along."). Accordingly, in light of Creamery's affirmatively holding out Smoker's products, the court cannot say that Creamery has carried its heavy burden to show Smoker's use of "Tillamook Country Smoker" will inevitably cause confusion.

Moreover, especially given the probable lack of any public health risks implicated by this case, it is appropriate to focus on the equities as they exist between the parties. And equity weighs against allowing Creamery to rely on possible confusion to avoid laches when it actively encouraged for years the sale of Smoker's products. Cf. *Dwinell–Wright Co.*, 132 F.2d at 825–26 ("[H]ow [plaintiff] can expect us to stifle a competition which with complete complaisance, and even with active encouragement, it has allowed to grow like the mustard tree; why we should destroy a huge business built up with its connivance and consent: this we find it impossible to understand.").

In summary, the doctrine of laches bars Creamery from objecting to Smoker's use of "Tillamook Country Smoker." Smoker's use of "Tillamook Jerky," however, as discussed below, presents different issues.

## IV. "TILLAMOOK JERKY"

■ As mentioned, sometime in 1999, Smoker adopted "tillamookjerky.com" for its website's domain name. And for three months beginning in late 2000 Smoker sold a line of products under the name "Tillamook Jerky." Smoker, in fact, applied for federal trademark registration of the mark "Tillamook Jerky." Creamery seeks a judgment preventing Smoker from using that mark.

As an initial point, given that it only recently used "Tillamook Jerky"—a materially different mark from "Tillamook Country Smoker"—Smoker does not lodge a laches defense as to the use of the name "Tillamook Jerky," as either a name appearing on labels or comprising part of its domain name. Thus the only question for the court is whether the use of "Tillamook Jerky" infringes Creamery's trademark rights. As there are no disputed material facts requiring the court to weigh the evidence, the court, for the reasons discussed below, grants summary judgment in favor of Creamery regarding Smoker's use of "Tillamook Jerky."[6]

The parties agree that the "core element of trademark infringement is the likelihood of confusion." *E & J Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1290 (9th

---

"Tillamook." However, it is rendered much less persuasive by the fact that Creamery actually sold the "chew" products for almost five years in its factory store and catalog.

**6.** In reaching this conclusion the court treats the domain name "tillamookjerky.com" the same as the name without the ".com." See, e.g., *Interstellar Starship Servs., Ltd. v. Epix,*

*Inc.*, 184 F.3d 1107, 1110 (9th Cir.1999) (concluding that "epix.com" is "for all intents and purposes identical" to the mark "EPIX"); *Brookfield Communications, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1055 (9th Cir.1999) ("there are differences in capitalization and the addition of '.com' in West Coast's complete domain name, but these differences are inconsequential. . . .").

Cir.1992). The likelihood-of-confusion analysis seeks to determine whether "the similarity of the marks is likely to confuse customers about the source of the products." *Id.* In making this determination courts apply a well-known test requiring a balancing of eight factors: (1) the strength of the mark, (2) the proximity or relatedness of the goods, (3) the similarity of the marks, (4) evidence of actual confusion, (5) the marketing channels used, (6) the degree of care customers likely are to exercise in purchasing the goods, (7) the defendant's intent in selecting the mark, and (8) the likelihood of expansion into other markets. *AMF, Inc. v. Sleekcraft Boats,* 599 F.2d 341, 348–49 (9th Cir.1979). This test, however, is a "pliant" one, pursuant to which a court may deem certain factors as " 'much more important than others.' " *GoTo.com, Inc.,* 202 F.3d at 1205 (quoting *Brookfield Communications, Inc. v. West Coast Entertainment Corp.,* 174 F.3d 1036, 1054 (9th Cir.1999)). For example, three factors—similarity of the marks, relatedness of the goods or services, and the marketing channels used—have been characterized as "the controlling troika in the *Sleekcraft* analysis." *Id.;* see, e.g., *CSC Brands, L.P. v. Herdez Corp.,* 191 F.Supp.2d 1145, 1149 (E.D.Cal.2001). The court, therefore, will first consider these three factors.

## A. Similarity of Marks

■ This *Sleekcraft* factor calls on the court to determine the similarity of sight, sound, and meaning of the marks at issue. *Sleekcraft,* 599 F.2d at 351. "[S]imilarities weigh more heavily than differences." *Id.*

Taking out the "Country Smoker" part of Smoker's name leaves a mark the focus of which is "Tillamook." Creamery's products almost invariably emphasize only the word "Tillamook" and generally are identified, for example, as "Tillamook cheese." Similar to the expression "Tillamook cheese," the use of the word "jerky" following "Tillamook" merely serves to identify the actual product. Although the packaging design which used "Tillamook Jerky" was not otherwise similar to Creamery's packaging, the brunt or dominant element of both companies' packaging is the use of the word "Tillamook." This factor favors Creamery.

## B. Relatedness or Proximity of Goods

In the words of the Ninth Circuit, related goods are those "which would be reasonably thought by the buying public to come from the same source if sold under the same mark." *Sleekcraft,* 599 F.2d at 348 n. 10 (citation omitted). "Related goods are generally more likely than unrelated goods to confuse the public as to the producers of the goods." *Brookfield,* 174 F.3d at 1055; see also *E & J Gallo Winery,* 967 F.2d at 1291 ("Where goods are related or complementary, the danger of consumer confusion is heightened.").

The court views this as an important factor, given the geographic origin of the word "Tillamook" and thus the many local business names using that word. The court concludes that cheese and smoked meat snacks are particularly closely related. Cf. *E & J Gallo Winery,* 967 F.2d at 1291 (upholding district court's finding that wine and cheese are closely related because they are "complementary products, frequently served and promoted together"); *In re Martin's Famous Pastry Shoppe, Inc.,* 748 F.2d 1565, 1567 (Fed.Cir. 1984) (finding likelihood of confusion between "Martin's" for bread and "Martin's" for cheese, since the products "travel in the same channels of trade," are sold by the "same retail outlets," and are "often used in combination"). As Creamery points out, the Trademark Appeals Board has found a likelihood of confusion between cheese and meat products, reason-

ing: "[S]ausage ... and cheese are frequently used together.... Further, these are goods which may very well be purchased in the same store." *In re Vienna Sausage Mfg. Co.*, 1986 WL 83615, 230 USPQ 799, 800 (Trademark Tr. & App. Bd. 1980). Indeed both Creamery and Smoker have marketed snacks conjoining smoked meat and cheese products. Moreover the parties have marketed Smoker's meat products with Creamery's cheese products in gift baskets. As the Trademark Office essentially found in 1985, this *Sleekcraft* factor favors Creamery.

## C. Marketing Channels

"Convergent marketing channels increase the likelihood of confusion." *Sleekcraft*, 599 F.2d at 353. And when two companies' " general class" of purchasers is the same confusion is more likely. *Id.*

Creamery correctly asserts that its marketing channels overlap with those used by Smoker. Both companies' products appear in the same supermarkets and thus are likely to be encountered by consumers during the same shopping trip. See, e.g., *CSC Brands L.P.*, 191 F.Supp.2d at 1149 (concluding "marketing channels" factor favored infringement finding where both companies "sell to supermarket chains including ... Safeway, Albertson's, ... and Wal–Mart"). Smoker argues that the fact both companies sell to supermarkets is not probative, because just about any product can be found in those stores. But, to take one of Smoker's examples, the two products at issue are not cheese and motor oil, but rather two related, low-dollar food products. Furthermore the two products are found together in other smaller stores. In addition both companies use the Internet, a venue which, even in using narrowly defined searches, likely will cause consumers to view the companies' products together. See *Brookfield*, 174 F.3d at 1057 ("both utilize the Web as a marketing and advertising facility, a factor that courts have consistently recognized as exacerbating the likelihood of confusion."). This factor favors Creamery.

Thus the so-called "troika" of *Sleekcraft* factors favors Creamery. The remaining issue, therefore, is whether the remaining factors tip the scale back in favor of Smoker.

## D. Strength of Mark

■ Arbitrary or fanciful marks are inherently distinctive and thus strong. *Brookfield Communications*, 174 F.3d at 1058. Tillamook, however, is a geographic name. A geographic name is generally descriptive of a product and thus presumptively weak. See, e.g., *Boston Beer Co. v. Slesar Bros. Brewing Co.*, 9 F.3d 175, 180 (1st Cir.1993). Unlike arbitrary or fanciful marks, in order to obtain protection for a geographic name a party must show the name has taken on "secondary meaning," *i.e.*, the mark "has come through use to be uniquely associated with a specific source." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 766 n. 4, 769, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992) (citation omitted); see also *Boston Beer Co.*, 9 F.3d at 180–81. That is, secondary meaning connotes that when consumers encounter "Tillamook" branded products they associate the products with a particular source, rather than just with the particular place, the Oregon coastal town. See generally McCarthy on Trademarks 15:5–:10. Once a geographic designation or mark takes on secondary meaning "the proprietorship in the designation or mark will be afforded as complete protection as if it were a 'strong' mark at the inception." *North Am. Aircoach Sys., Inc. v. North Am. Aviation, Inc.*, 231 F.2d 205, 210 (9th Cir.1955); cf. *E & J Gallo Winery*, 967 F.2d at 1291 ("While personal names used as trademarks are not inherently distinctive, they

are treated as strong marks upon a showing of secondary meaning.").

Smoker concedes that "Tillamook" has taken on a secondary meaning as to dairy products, but argues that such secondary meaning cloaks Creamery's mark with protection only as to competing dairy products, not meat products. However all "that is necessary to establish a secondary meaning is that the ordinary buyer associates the mark with a single, albeit anonymous, source." McCarthy on Trademarks § 15:8. Thus secondary meaning requires a mental association between a mark and *a source,* not between a mark and a particular product. See *id.* ("When the buyer sees *any related product* with that mark, he is entitled to assume that it comes from the same anonymous source as every other related product so marked." (emphasis added)). The Ninth Circuit, in any event, has rejected the argument that a mark—which was not initially strong but which has acquired secondary meaning through selling certain products—somehow becomes weak when considered in relation to other products:

> The district court found that the [family name] GALLO has acquired secondary meaning.... [Junior user] concedes that the mark has acquired secondary meaning as applied to wine. He nevertheless argues that the mark's strength does not entitle it to protection in other product fields. This argument goes more to the question of related products ... than it does to strength. The finding that GALLO is a strong mark simply means that it is more distinctive than a descriptive or suggestive mark, and therefore more susceptible to protection as an initial matter.

*E & J Gallo Winery,* 967 F.2d at 1291.

Moreover the "stronger the evidence of secondary meaning, the stronger the mark, and the more likely is confusion." *Levi Strauss & Co. v. Blue Bell, Inc.,* 632 F.2d 817, 821 (9th Cir.1980). As mentioned Smoker does not even challenge the existence of secondary meaning, probably because Creamery's evidence shows a particularly strong recognition of the "Tillamook" name in consumers' minds. This *Sleekcraft* factor favors Creamery.

**E. Actual Confusion**

Evidence of actual confusion is merely a factor to consider, since the ultimate question is whether there is a "likelihood" of confusion. Thus "the absence of such evidence need not create an inference that there is no likelihood of confusion." *E & J Gallo Winery,* 967 F.2d at 1292. But evidence that use of the two marks has already led to confusion is "persuasive proof that future confusion is likely." *Sleekcraft,* 599 F.2d at 352. A court, however, may discount such evidence if it is "unclear or insubstantial." *Id.*

As Smoker sold products under a "Tillamook Jerky" label for only about three months, Creamery does not set forth evidence of actual confusion regarding the use of that mark. Creamery, however, does set forth evidence, which on its face, is persuasive evidence of actual confusion regarding "Tillamook Country Smoker" branded products. But as already discussed *infra* the cause of the confusion is unclear. In light of Creamery's longstanding efforts to market Smoker products the court cannot say conclusively that consumers' confusion was caused by Smoker's use of the word "Tillamook," as opposed to the fact the consumers saw Smoker's products in Creamery's catalogs or factory store. As a result, the court concludes that this *Sleekcraft* factor does not favor granting summary judgment for Creamery.

**F. Degree of Care**

When "dealing with inexpensive products, customers are likely to exercise less

care, thus making confusion more likely." *Brookfield,* 174 F.3d at 1060. Since low-cost products generally are subject to impulse buying, consumers are more likely to rely on the initial impressions created by the visible trademarks.

Smoker concedes that purchasers exercise little care in purchasing both companies' products. This factor, therefore, favors Creamery.

### G. Smoker's Intent in Selecting the Mark

When a newcomer selects a mark which is similar to another company's mark courts have reasoned that it properly can be presumed that the newcomer seeks to confuse. See *E & J Gallo Winery,* 967 F.2d at 1293. The Ninth Circuit, however, has "emphasized the minimal importance of the intent factor: 'Importantly, an intent to confuse consumers is not required for a finding of trademark infringement.' " *GoTo.com, Inc.,* 202 F.3d at 1208 (quoting *Brookfield Communications,* 174 F.3d at 1059).

Creamery emphasizes that Smoker at all times knew about Creamery's "Tillamook" mark. And it is true that Mr. Dixon agreed only to the use of "Tillamook Country Smoker," and not to the use of "Tillamook Jerky." But Smoker, with Creamery's active cooperation, has used labels emphasizing the word "Tillamook" for almost thirty years. In addition Smoker explains that it sought to adopt the mark "Tillamook Jerky" as a defensive measure in response to a competing meat-snack manufacturer's recent attempt to sell products labeled "Tillamook." In sum, while the use of "Tillamook Jerky" rendered some of Smoker's labels and its domain name more similar to Creamery's mark, the court cannot say conclusively that Smoker's intent was to benefit improperly from Creamery's goodwill. Thus, on this record, this factor does not favor granting summary judgment for Creamery.

### H. Expansion into Other Markets

A " 'strong possibility' that either party may expand his business to compete with the other will weigh in favor of finding that the present use is infringing." *Sleekcraft,* 599 F.2d at 354.

Creamery argues that both it and Smoker have in the past marketed a "beef and cheese stick." Without citing any evidence, Creamery also asserts, "It is likely that both companies will continue to look at new food products as a source of growth."

Without further evidence on this point, the court concludes that this factor does not favor granting summary judgment for Creamery.

### I. Summary

 Three factors do not favor granting summary judgment in favor of Creamery. The remaining five factors—including the "troika" of *Sleekcraft* factors—favor granting summary judgment for Creamery. The court concludes that there are no material disputed facts which prevent the court from ultimately concluding that the use of "Tillamook Jerky" will likely cause confusion. Cf. *GoTo. Com, Inc.,* 202 F.3d at 1206 (emphasizing that consistent findings as to all of the eight factors are not necessary "to reach a conclusion as to whether there is a likelihood of confusion"). As a result, the court grants partial summary judgment in favor of Creamery.

The court acknowledges the apparent inconsistency between its finding that there is an insufficient showing of "inevitable confusion" as to the use of "Tillamook Country Smoker," see *infra,* and its finding that the use of "Tillamook Jerky" conclusively infringes Creamery's trademark

rights. But the core issue regarding "Tillamook Jerky" is whether use of the mark gives rise to a *likelihood* of confusion. In contrast, the core issue regarding "Tillamook Country Smoker" is whether Creamery met its "heavy" burden to show that use of the mark gives rise to *inevitable* confusion. *Harley–Davidson,* 13 F.Supp.2d at 285. Moreover different equitable considerations are presented with regard to the use of "Tillamook Country Smoker." Creamery affirmatively consented to the use of "Tillamook Country Smoker" and actively marketed products labeled with that name. Thus allowing Creamery to use the inevitable-confusion doctrine to prevent Smoker's use of "Tillamook Country Smoker" would be fundamentally unfair in this case. Smoker, in contrast, much more recently used the mark "Tillamook Jerky," and did so without the long history of cooperation associated with the "Tillamook Country Smoker" mark.

## V. CONCLUSION

For the reasons discussed above the court holds that laches bars Creamery from objecting to Smoker's use of "Tillamook Country Smoker." Creamery did not, on this record, establish any substantial changes implicating the encroachment doctrine.

But summary judgment is granted in favor of Creamery insofar as Smoker is prohibited from using the mark "Tillamook Jerky."

IT IS SO ORDERED DATED this 1st day of April, 2004.